CONSOLIDATED TIMBER CO. v. WOMACK.

WOMACK v. CONSOLIDATED TIMBER CO.

No. 10048.

Circuit Court of Appeals, Ninth Circuit.

Dec. 7, 1942.

Robert W. Maxwell, of Seattle, Wash.,
Philip Chipman, of Portland, Or. (Hart,
Spencer, McCulloch & Rockwood, of Port-

land, Or., of counsel), for appellant Consolidated.

Green & Landye, of Portland, Or., for appellant Womack.

Irving J. Levy, Acting Sol., Wage and Hour Division, Mortimer B. Wolf, Asst. Sol., and Edward J. Fruchtman, Atty., all of Washington, D. C., and Dorothy M. Williams, Regional Atty., of San Francisco, Cal., for Administrator of Wage and Hour Division, U. S. Department of Labor, amicus curiae.

Before GARRECHT, HANEY, and STEPHENS, Circuit Judges.

GARRECHT, Circuit Judge.

Consolidated Timber Company, a Washington corporation, is engaged in logging and lumbering in Oregon and has its headquarters at Glenwood, Oregon. It employs a logging crew and also has contracts with smaller companies which log part of its property and deliver logs to it at specified places. Some of the logs cut by Consolidated and its contracting companies are sold to mills in Washington County, Oregon, but the larger percentage of logs are sold to saw mills in Oregon and Washington. All sales are made and completed within the state of Oregon. The logs are then manufactured into lumber by the purchasing mills and in each instance at least 70 per cent. of the lumber manufactured from said logs moves in interstate commerce.

Between October 24, 1938, and June 28, 1940, Consolidated operated at Glenwood, Oregon, what is known in logging parlance as a cookhouse, which consisted of a kitchen and dining room in a building separate and apart from the other buildings of the Company. Cookhouse facilities were available to Consolidated's employees, to employees of contracting companies, and to the general public. Consolidated's employees were not, however, compelled to take their meals at the cookhouse; many of them lived in Glenwood and ate at home; further, the court found that the greater proportion of the Company employees took their meals elsewhere than at the Glenwood cookhouse. Many of the regular diners were employees of contracting companies, and an average of ten meals a day (that is, to an average of three plus persons) were served to strangers—the general public. There were, in addition, six persons who were employed in other businesses in Glenwood who regularly took their meals at this cookhouse. Meals served to these persons, to the general public, and to the employees of companies under contract to Consolidated were paid for in cash; those taken by Consolidated employees were paid for by deductions out of wages. Consolidated employees were charged approximately ten per cent. less per meal than were those who paid in cash. This is accounted for in an agreement between an employers' association, of which Consolidated was a member, and the employees' union, to the effect that cookhouses in the logging area be operated as self-sustaining, but without profit, that is, at cost.

The Company also operated another cookhouse, subsequent to June 10, 1940, at a point located approximately seventeen miles southwest of Glenwood, known as Camp 2. This cookhouse, which also consists of a dining room and kitchen, is also in a building separate from the other Company buildings at Camp 2. Its facilities are used by substantially all of Consolidated's employees at Camp 2, and it is the only practicable eating facility at said Camp. The employees are not, however, required to eat there, and occasionally, though rarely, some do go into Glenwood, seventeen miles distant. The cookhouse is used, as well, by employees of companies under contract to Consolidated and a few of the general public who might visit Camp 2. Meals are paid for at the same rates, and in the same manner, as at Glenwood.

Consolidated Timber Company employs from 275 to 315 employees, all of whom, except salaried employees, engage in its logging operations on a forty hour week basis (since October 24, 1938) and are paid at the rate of time and one-half for all time in excess thereof. A limited number of persons, including some employed in the cookhouses, are employed by the Company at an agreed monthly wage. Although logging operations are carried on only five days a week, the cookhouses are customarily kept open seven days a week, operated by a skeleton crew on the "off-days," for the convenience of those who use them even when logging operations are interrupted.

Ivan Womack, plaintiff below, was employed as a baker in one of the aforesaid cookhouses at a monthly salary of $125, plus room and board of a reasonable value of $45 a month. Womack filed a complaint in the district court against Consoli-

dated Timber Company, under the provisions of the Fair Labor Standards Act of 1938, 52 Stat. 1060, 29 U.S.C.A. §§ 201–219, claiming that from October 30, 1938, to the date of the complaint he did work or was compelled to work overtime hours in excess of number of hours prescribed in said Act as the length of the workweek; that he was not informed of the precise number of overtime hours he was compelled to work, but that such information was in the possession of the defendant. He prayed judgment for the overtime pay which he alleged he was entitled to as liquidated damages, and also for attorney fees.

The complaint was framed in five causes of action. The first we have just outlined; the remaining four were similar in allegation and prayer, save that in each instance the named employee was a different person, although the employer was the same. The amount sought to be recovered varied in each cause of action. Each of the individuals named in each of the latter four causes of action had assigned his claim to the plaintiff, Ivan Womack.

The answer of the defendant, Consolidated Timber Company, admitted the employment, operation of the logging business, and maintenance of the cookhouses, but denied that the plaintiff or his assignors were engaged in the production of goods for commerce within the meaning of the provisions of the statute sued under. It further alleged that if the employment was within the Act, it was specifically exempted by Section 13(a) (2) thereof.

The facts were stipulated to prior to trial, which was had before the court without a jury. The trial judge rendered an opinion (D.C., 43 F.Supp. 625), as a result of which he determined that the cookhouse located in the town or village of Glenwood was a retail or service establishment and, therefore, exempt, but that the cookhouse at Camp 2 was "an adjunct to the production of goods and employees therein are assisting in that process" and within the Act. Findings of fact and conclusions of law were entered, and decree filed in accordance therewith.

Consolidated appeals, contending, first, that the employees in a logging camp cookhouse are not engaged in the production of goods for commerce within the meaning of Section 7(a) (2) of the Fair Labor Standards Act and, secondly, that the logging camp cookhouse at Camp 2 is a retail or service establishment within the meaning of Section 13(a) (2) of the Act and that the provisions of Sections 6 and 7 of the said Act, relating to hours of labor, are not applicable.

Cross appeal is taken by Womack, who urges that the cookhouse at Glenwood is not a retail or service establishment and that the provisions of Sections 6 and 7 of the Act apply.

It is perhaps unnecessary for us to comment that both parties appear desirous of upholding that part of the decision of the lower court which is in their favor.

■ For the record, and solely in the interest of clarity, we pause here to observe that the amount in controversy in each cause of action falls far below the ordinary minimum jurisdictional amount of $3,000 exclusive of interest and costs prescribed by 28 U.S.C.A. § 41(1); when aggregated the claims total approximately $2,600, also under the required amount. Subdivision (8) of said Section 41, however, vests in the District Court original jurisdiction of "all suits and proceedings arising under any law regulating commerce." This subdivision confers jurisdiction in the said court of the instant case, regardless of the amount involved, or of diversity of citizenship, for that matter. Mulford v. Smith, 307 U.S: 38, 46, 59 S.Ct. 648, 83 L. Ed. 1092.

Section 6 of the Fair Labor Standards Act of 1938, 52 Stat. 1060, 1062, prescribes the minimum wages which may be paid an employee. Section 7 of said Act sets out the maximum hours which an employer shall employ any of his employees "engaged in commerce or in the production of goods for commerce" during a workweek, "unless such employee receives compensation for his employment in excess of the hours * * * specified at a rate not less than one and one-half times the regular rate at which he is employed." Section 13(a) (2) provides: "The provisions of sections 6 and 7 [sections 206 and 207 of this title] shall not apply with respect to * * * (2) any employee engaged in any retail or service establishment the greater part of whose selling or servicing is in intrastate commerce; * * *."

The first question to be answered is whether the employees here involved were engaged in commerce or in the production of goods for commerce as that phrase is used in Section 7(a) of the Fair Labor Standards Act of 1938, 52 Stat. 1060. Sec-

tion 3(j) of the said Act, after defining the word "produced" as meaning "produced, manufactured, mined, handled, or in any other manner worked on in any State," provides that "for the purposes of this Act [chapter] an employee shall be deemed to have been engaged in the production of goods if such employee was employed in producing * * *, or in any other manner working on such goods, or in any process or occupation necessary to the production thereof, in any State."

■ Since a high percentage of the goods handled or "produced" by Consolidated is destined to, and does, move in interstate commerce, we are satisfied, and it is not to our knowledge contended otherwise, that the loggers (using that term in its general connotation, and not in the vernacular) employed by Consolidated are engaged in the production of goods for commerce. United States v. Darby, 312 U. S. 100, 117, 118, 61 S.Ct. 451, 85 L.Ed. 609, 132 A.L.R. 1430; Hamlet Ice Co. v. Fleming, etc., 4 Cir., 127 F.2d 165, 170; Enterprise Box Co. v. Fleming, etc., 5 Cir., 125 F.2d 897, 899; Warren-Bradshaw Drilling Co. v. Hall et al., 5 Cir., 124 F. 2d 42, 44, affirmed 63 S.Ct. 125, 87 L.Ed. ——. We pass now to consider a more vital problem, namely, are the cookhouse employees who prepare and serve meals to these "loggers," by reason thereof engaged "in any process or occupation necessary to the production" of the timber which moves in interstate commerce?

The Supreme Court case of Philadelphia, Baltimore & Washington R. Co. v. Smith, 250 U.S. 101, 39 S.Ct. 396, 63 L.Ed. 869, decided May 19, 1919, merits our attention. That case involved an interpretation and application of the provisions of the Federal Employers' Liability Act, as amended, 35 Stat. 65, 36 Stat. 291, 45 U.S.C.A. § 51 et seq. Smith was an employee of an interstate railroad; his duties were to cook the meals, make the beds, etc., for a "gang" of bridge carpenters, who were employed by the railroad to repair the bridges, and bridge abutments, along the railway line; the gang, including Smith, moved from place to place along the railroad line in a camp car to facilitate their work in repairing the various bridges. Smith was injured while within the said car, on a side track, as a result of a locomotive colliding with the car while he was occupied cooking a meal for the bridge carpenters, who were repairing a bridge

in the vicinity. Smith brought action under the provisions of the Federal Employers' Liability Act, supra; the defendant railroad contended the plaintiff was not engaged in interstate commerce so as to come within the statute. From a judgment in favor of plaintiff the railroad appealed. Discussing the relation of the plaintiff's work to that of the bridge carpenters (whose work was in interstate commerce), the Supreme Court at page 103 of 250 U.S., at page 396 of 39 S.Ct., 63 L. Ed. 869, said:

"* * * It may be freely conceded that if he [the plaintiff] had been acting as cook and camp cleaner or attendant merely for the personal convenience of the bridge carpenters, and without regard to the conduct of their work, he could not properly have been deemed to be in any sense a participant in their work. But the fact was otherwise. He was employed in a camp car which belonged to the railroad company, and was moved about from place to place along its line according to the exigencies of the work of the bridge carpenters, no doubt with the object and certainly with the necessary effect of forwarding their work, by permitting them to conduct it conveniently at points remote from their homes and remote from towns where proper board and lodging were to be had. * * * The significant thing, in our opinion, is that he was employed by defendant to assist, and actually was assisting, the work of the bridge carpenters by keeping their bed and board close to their place of work, thus rendering it easier for defendant to maintain a proper organization of the bridge gang and forwarding their work by reducing the time lost in going to and from their meals and their lodging place. * * *"

■ The reasoning used by the Supreme Court in solving the problem in the above case is applicable to the case at bar. To be sure, neither cookhouse was mounted on wheels that it might be moved in interstate commerce, as was the camp car, but this is simply an incident and not a ground for the decision in the case. The employees in our case (compare the last sentence just above quoted) were actually assisting the work of the loggers by keeping their board close to their place of work, thus rendering it easier (perhaps, even, possible) for Consolidated to maintain a proper organization of its loggers and forwarding their work by furnishing

the food whereby the men were given the strength to pursue their labors. And, in our determination, we find ourselves well within the limitations—the lines drawn—in a case lately announced by the Supreme Court involving substantially the same basic question, Kirschbaum v. Walling, and Arsenal Bldg. Corp. v. Walling, 316 U.S. 517, 62 S.Ct. 1116, 86 L.Ed. 1638.[1] It was questioned in each case in the trial courts, whether building maintenance employees of building owners were brought within the protection of the Fair Labor Standards Act, supra, by reason of the fact that tenants occupying space in the buildings were engaged in the production of goods for commerce. The Supreme Court said (at page 1121 of 62 S.Ct.):

" * * * In our judgment, the work of the employees in these cases had such a close and immediate tie with the process of production for commerce, and was therefore so much an essential part of it, that the employees are to be regarded as engaged in an occupation 'necessary to the production of goods for commerce.' "

See also Southern Pacific Co. v. Industrial Accident Commission, 251 U.S. 259, 263, 40 S.Ct. 130, 131, 64 L.Ed. 258, 10 A. L.R. 1181, where it is said " * * * the character of the employment, in relation to commerce, may be adequately tested by inquiring whether, at the time * * *, the employé was engaged in work so closely connected with interstate transportation as practically to be part of it. * * * "

Having established to our satisfaction that the cookhouse employees were engaged in a "process or occupation necessary to the production" of goods for commerce, we shall next consider whether the work in which they were engaged was "in any retail or service establishment the greater part of whose selling or servicing is in intrastate commerce." To do so, it is necessary for us to enlarge somewhat upon the pertinent facts already recited herein by reciting some more detailed facts as they are revealed by the transcript of record.

The parties selected a certain month as typical of the number of meals served in the Glenwood cookhouse, and to whom served. In this typical month Consolidated employed 302 persons; 217 men regularly used the cookhouse, of whom 110 were employees (including 18 cookhouse employees) of Consolidated, 101 were employees of logging companies under contract to Consolidated, and 6 were employees of independent businesses operated at Glenwood. One hundred ninety-two employees of Consolidated did not use the cookhouse. During the same typical month 302 meals—an average of ten a day, were served to strangers.

It also appears, from other evidence, that in August or September, 1940, there was opened in the postoffice at Glenwood a lunch counter having approximately six stools, at which were served sandwiches, coffee, and ice cream. At the time of trial the cookhouse in Glenwood was being operated by a union member as a private enterprise; he paid the Company a nominal rental of $1 a month for the facilities.

There was no road to or from Camp 2, except the Company railroad, and the only means of travel was by train or track speeder. Generally speaking, all of the Consolidated employees at Camp 2 and some of the employees of contracting companies eat regularly at the cookhouse there. It is admittedly necessary to have a cookhouse at Camp 2, whether operated by the Company or as an independent enterprise by third parties.

Counsel for Consolidated argue that the cookhouse employees were employed in a service establishment the greater part of whose service was in intrastate commerce and that the cookhouse employees were within the exemption or exception of Section 13(a) (2) of the Act. It is elementary, of course, that the Act is remedial and that persons claiming to come within exemptions therein must bring themselves within both the letter and the spirit of the exceptions, which are subject to a strict construction. Bowie v. Gonzalez, 1 Cir., 117 F.2d 11, 16; Fleming v. Hawkeye Pearl Button Co., 8 Cir., 113 F.2d 52, 56.

We think it quite generally understood by both lawyer and layman that an ordinary restaurant or eating place "renders a service" rather than "makes a sale," and that a restaurant is a "service" rather than a "retail" establishment; it not being contended otherwise, we shall so assume for the purpose of the following discussion. Considering the applicability of Section 13(a) (2), the Circuit Court of Appeals

---

[1] Fleming v. A. B. Kirschbaum Co., 3 Cir., 124 F.2d 567, and Fleming v. Arsenal Bldg. Corp., 2 Cir., 125 F.2d 278, affirmed.

for the Third Circuit, in Fleming v. A. B. Kirschbaum Co., supra, at page 572 of 124 F.2d, said:

" * * * It is clear that to come within the exemption not only must the employees render service the greater part of which is in intrastate commerce but they must also be engaged in a 'service establishment.'

" * * * It is fair to infer that the type of establishment meant is that which has the ordinary characteristics of a retail establishment except that it sells services instead of goods. In other words it is an establishment the principal activity of which is to furnish service to the consuming public. Typical retail establishments are grocery stores, drug stores, hardware stores and clothing shops. In Wood v. Central Sand & Gravel Co., D.C.W.D. Tenn.1940, 33 F.Supp. 40, 47, the court suggested as illustrations of what Congress meant by service establishments 'barber shops, beauty parlors, shoe-shining parlors, clothes pressing clubs, laundries, automobile repair shops.' We think these illustrations apt. * * *"

In our opinion the exemption invoked was not intended to apply in a situation such as confronts us in the instant case. Here the cookhouse was a "necessary" part of the Company's production of goods for commerce. It was not operating with the intent or purpose of showing a profit to the owners from the sale of food or service, but to render a very necessary assistance to the business of the Company, which was the production of logs in interstate commerce. The cookhouse was not a separate or independent establishment; it was actually a *part* of the Company's facilities—a link in the chain—whereby it operated its business and a means whereby it accomplished the purpose of its existence. Neither cookhouse was in competition with any private restaurant for there is no evidence of an effort to secure the patronage of the general public; the service was sold at cost to those whom the cookhouse was intended to serve: the loggers. The principal activity of the cookhouse definitely was not to furnish service to the consuming public, as such, but was to serve the employees of the Company.

Our conclusion here does not have the effect of writing the exemption out of the Act, for we are of the opinion that the retail or service establishment exempted by the Act is not one which is part of the production of goods for commerce, or a link in a chain to that end, but more precisely an establishment, probably independent, devoted to serving the public generally, the lesser part of its business being in interstate and the greater in intrastate commerce. It here occurs to us that perhaps it may not truthfully be said that the greater part of the servicing of either cookhouse was in intrastate commerce. Was not the greater number of diners at the cookhouses engaged in the production of goods for commerce?. Were not the cookhouses an integral part of an organization devoted to the production of goods for commerce? Does it not follow, reasonably and logically, that the greater part of the service rendered by the cookhouses was in interstate commerce rather than intrastate?

We are unable to make out any fundamental distinction between the basic purpose and integration in the Company business between the Glenwood cookhouse and that at Camp 2. If there be any difference, it is but of degree. Each accomplishes the same purpose, each is a unit in the facilities necessary to the Company's production of goods for commerce. The argument that because the Glenwood cookhouse is situated in a village wherein is also located a lunch counter or fountain equipped with a half dozen stools, serving sandwiches and coffee, is not persuasive. No such establishment could supply the necessary meals required by several hundred hungry laborers. Moreover, it is of no consequence to argue that the Company might have employed loggers residing in the vicinity who would not be under the necessity of eating at a cookhouse, because it is not what could have been the fact, but what actually was the fact, upon which the decision must rest.

The conclusion of the court below that the Glenwood cookhouse is within the exception of Section 13(a) (2) is not supported by the facts found; the conclusion that the Camp 2 cookhouse is not within the said exemption is supported by the facts found. Therefore, the decree of the lower court dated January 8, 1942, is set aside, with directions to enter a decree in accordance with this opinion.