496

**TIPTON et al. v. BEARL SPROTT CO., Inc.**

No. 6343–Y.

United States District Court
S. D. California, Central Division.

Oct. 18, 1950.

The action was for recovery of wages under the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq., especially Secs. 206, 207, alleged to be due for services rendered to the defendants during the years 1945 and 1946.

The contents of the original Complaint appear in Tipton v. Bearl Sprott Co., 9 Cir., 1949, 175 F.2d 432. The amended Complaint supplied the facts found to be missing in the original Complaint.

On trial, the case was submitted on agreed facts, which are summarized here.

The population of Los Angeles County, in the year 1945, was three million three hundred seventy five thousand persons, and in the year 1946, was three million four hundred seventy five thousand persons.

The City of Torrance is a city of 18.9 square miles in area, located in Los Angeles County, California. Its population was, in

the year 1946, twelve thousand seven hundred and twenty.

The plant of the Columbia Steel Company (to be referred to as "Columbia") where the in-plant feeding operations connected with this action were carried on, is located at 840 Border Avenue, in the City of Torrance, in the main downtown central business and shopping district of Torrance, in the midst of the most crowded and active business center of the city.

There were, in the fourth quarter of 1949, eleven thousand three hundred fifty three restaurants in the County of Los Angeles, according to the statistics and figures of the Board of Equalization of the State of California. There were, in the years 1945 and 1946, approximately nine thousand restaurants in the County of Los Angeles. There were, in 1945 and 1946, in the City of Torrance, in the central and business area thereof, twenty three restaurants, of which more than two-thirds were within a quarter of a mile of an entrance to the Columbia Steel Company plant.

One of the restaurants available to the employees of Columbia is known as Daniel's Cafe, which has been operating continuously for more than fifteen years, houses the Bus Depot, contains a large number of booths and tables, together with a large banquet or dining-room for the use of clubs and organizations.

In addition to Daniel's Cafe and also immediately available to the employees of Columbia, during the years 1945 and 1946, were numerous other large cafes, among which were Vurp's, Helen's Cafe and Ding How's Chinese Cafe. During the entirety of 1945 and 1946, there were three restaurants across the street from the main gate, each having seating capacity approximately equal to the seat capacity in defendant, Bearl Sprott Company, Inc.'s lunch room and canteen, and closer to the work places of some Columbia employees than the lunch room and canteen. (The defendant will be referred to as "Sprott".)

The lunch room and canteen was, during the whole of 1945 and 1946, located on the grounds of Columbia 300 feet northerly of the main gate and 200 feet westerly of the main buildings and employees from the southerly end of the main buildings passed within fifty feet of the main gate in the event that they were going to the lunch room and canteen from their work. The three nearest outside restaurants were sixty feet outside the main gate.

During the entirety of 1945 and 1946, there were, in addition, numerous traveling lunch stands serving sandwiches, coffee, drinks, and hot dishes were available about the entrance to the Columbia plant and other plants in the City of Torrance.

During the entirety of 1945 and 1946, there were also immediately available to the Columbia plant, sandwich shops, hamburger stands and coffee shops and luncheonettes.

The in-plant feeding operation of defendant Sprott existed in competition with the mentioned restaurants, cafes, dining-rooms, coffee shops, sandwich shops, hamburger stands, luncheonettes and lunch wagons, and Sprott met or bested the competition in matters of price, food quality and size of portions. Sprott's operation resulted in a loss in the sum of $5923.82 in the year 1945, and $6194.28 to September 1, 1946. The operation was abandoned upon thirty days' notice at the end of August, 1946.

A predecessor of Sprott, one Cunningham, stopped his operation of the lunchroom and canteen in Columbia, and constructed a restaurant across from Columbia's main gate, which he still operates, and which is known as "Cunningham's". Some employees of Columbia brought their own lunches and some of them lived within walking distance of the plant and went home for lunch, during the entirety of 1945 and 1946.

The Columbia plant, in addition to being situated in a County with a population of three million four hundred seventy five thousand persons in the year 1946, is located in a prosperous regional area, within the County, in the center of the population of the City of Torrance, together with the Cities of Redondo, Gardena, Lomita, Hermosa Beach, and the Hollywood Riviera District, which is the suburban portion of the City of Torrance.

The City of Torrance is located near the City of Long Beach, the downtown areas

of the two cities being eight miles apart. The downtown area of the City of Torrance is fifteen miles from the downtown area of the City of Los Angeles and ten miles from the downtown area of the City of Inglewood.

The average labor force at Columbia Steel Company was 1500 men. The normal working month amounted to 26 days, and the average minimum meal was $0.50.

During 1945 and 1946, all employees of Columbia could come and go at will through the plant gate, merely being required to show identification badges. Such egress and ingress was not confined to set hours.

During the period with which this action is concerned, Columbia operated three shifts on a twenty-four hour basis; the in-plant feeding operation was carried on on all three shifts by Sprott.

Columbia did not, at any time, furnish lunch room, canteen, or any other help to Sprott, or issue rules governing the conduct of Sprott's employees. The in-plant lunch room and canteen, at all times mentioned, were open only to employees and business visitors of Columbia.

At all times, Columbia was engaged in the production of steel products for interstate commerce and intrastate commerce. Other facts appear in the Opinion to follow.

Margolis & McTernan by John W. Porter, Los Angeles, Cal., for the plaintiffs.

John Moore Robinson, Robert M. Himrod, Los Angeles, Cal., for the defendant.

YANKWICH, District Judge (after stating the facts as above).

As the case stands now, the facts are not in dispute, and it only remains for the Court to draw conclusions from the admitted facts. I have not had the benefit of any oral testimony. The advantage of the situation is that, if the Court of Appeals is not satisfied with the conclusions I have drawn, they may draw their own.

█ It is the accepted rule that where a case is presented on stipulated facts, the mandate of Fed.Rules Civ.Proc. Rule 52, 28 U.S.C.A., that "findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the oppor-

tunity of the trial court to judge of the credibility of the witnesses" does not come into play. In short, when there are no witnesses, and the Court draws inferences from agreed facts, then the presumption of the correctness of the trial court's findings does not apply. The Courts have so held repeatedly, and have not hesitated to draw different legal conclusions from admitted facts. See Yankwich, Findings, In the Light of Recent Statutory Amendments, 1948, 8 F.R.D. 271, 281–282; Wigginton v. Order of United Commercial Travellers, 7 Cir., 1942, 126 F.2d 659.

## I. The Nature of the Agreement between Columbia and Sprott

Basically, we start from the contract. This contract, on close examination, does not disclose a joint enterprise. It is, in reality, merely a leasehold. Its general effect is to allow the use of certain premises in consideration of certain undertakings by Sprott.

The preamble of the contract entered into on November 1, 1944, after reciting that Columbia Steel is operating a steel-manufacturing plant, referred to as the Torrance Works, located at Torrance, stated that the party of the second part, Sprott, "* * * is in the business of providing food for employees in plants such as first party's plant above mentioned, and the parties here desired to provide an arrangement pursuant to which second party will prepare food for the first party's employees at said plant and sell it to them on the premises."

Columbia allowed Sprott to use the premises. The provision of the contract which covers the letting is Paragraph 1, which reads: "First party agrees to allow second party the *use at no cost of the restaurant building* at said Torrance Works so as to enable second party to prepare, sell, and serve hot foods, cafeteria style, to all of the first party's employees in said Torrance Works who may care to purchase them". (Emphasis added.)

Columbia agreed to erect a wooden building for use as a canteen. Sprott agreed to conduct the cafeteria and to pay all operating expenses, to comply with all the laws,

to serve the meals, protect himself by insurance, and to comply with all wartime regulations relating to explosives and the like.

The only control which Columbia exercises over Sprott, under the contract, is to limit his profits so that they may not exceed ten per cent of his gross income from the operations. To that end, the contract provides for the keeping of books and for periodical auditing, in order to ascertain what the profits are.

The agreement is terminable on 30 days' notice by either side.

█ I find no provision for sharing of profits in this contract. Under the law of California, which governs, I am satisfied that this instrument created a relationship of landlord and tenant. In re Owl Drug Co., D.C.Nev.1935, 12 F.Supp. 439, 444, I determined that an agreement such as this, which turns over premises to another person in which to carry on a business is a leasehold. I quote from the case:

"Clearly there is no mere license. Nor is there a partnership or joint adventure here, because the lessor does not share in the loss. It is true that a joint adventure or partnership appearing, a sharing of the loss may be inferred by the court, which may even determine the manner of sharing the profits where the agreement is silent. California Civil Code, §§ 2401, subd. (4), 2412; Irvine & Muir Lumber Co. v. Holmes, 1915, 26 Cal.App. 453, 147 P. 229. See San Francisco Iron & Metal Co. v. American Milling & Industrial Co., 1931, 115 Cal.App. 238, 246, 247, 1 P.2d 1008. But the lessor has surrounded himself with such a protective armour, so far as any liability for any act of the lessee is concerned, that it would be impossible without doing violence to the instrument and making a new contract, to infer an obligation to share in any loss. * * * It is true that the lessor sought to integrate the department into its store; but such integration was only for the purpose of having it, and the business to be conducted in it, conform to its *general* policy. Such a requirement was an absolute necessity

if friction between the lessor and the lessee was to be avoided. But the supervisory powers which the lessor retained were not of such a nature as to deprive the lessee of that exclusive possession of a definite portion of the premises, the situs of which could be changed by the lessor upon thirty days' notice to the lessee and upon his substituting a site equal in area, and of which he could not be deprived except for breach of the conditions—which is the characteristic of a lease." 12 F.Supp. at pages 444–445. * * *

"We conclude that the relationship created by the instrument under discussion is that of landlord and tenant." 12 F.Supp. at page 445.

## II. The Status of Sprott's Employees

I think this approach is important, because, in the case on which Sprott relies,—Armour & Co. v. Wantock, 1944, 323 U.S. 126, 65 S.Ct. 165, 89 L.Ed. 118,—Mr. Justice Jackson referred to the fact that, while the question whether employees are covered by the Fair Labor Standards Act must be determined by the work in which the employee engages, it is important in each case to determine *by whom the employee was hired*. His Opinion states: "The fact that respondents were hired by an employer which shows no ostensible purpose for being in business except to produce goods for commerce is not without weight, even though we recognized in Kirschbaum v. Walling, that it might not always be decisive, 316 U.S. [517], at page 525, 62 S.Ct. at page 1121, 86 L.Ed. 1638. A court would not readily assume that a corporation's management was spending stockholders' money on a mere hobby or an extravagance. The company does not prove or assert that this fire protection is so unrelated to its business of production that it does not for income-tax purposes deduct the wages of these employees from gross income as 'ordinary and necessary expenses.' Int.Rev.Code, § 23(a) (1) 26 U.S.C.A.Int.Rev.Code § 23(a) (1). The record shows that this department not only helps to safeguard the continuity of production against interruption by fire but serves a fiscal purpose as well. Without

the department, insurance could not be obtained at any price except by employing enough watchmen to make hourly rounds; with it, only enough watchmen for rounds every two hours are needed." 323 U.S. at page 130, 65 S.Ct. at page 167.

Whether we will it or not, when we interpret social statutes, we have to bear in mind the economic realities to which they were directed, and the position of the employee who seeks coverage.

In determining that position, one of the elements to consider is *by whom he is employed.* In this case, as appears from what has already been said, the employment was by Sprott who had undertaken, *as an independent contractor,* under a lease, to operate a cafeteria upon premises owned by Columbia, which were on land contiguous to the building in which the operations of the steel company were carried on.

In the decision in which the Court of Appeals wrote in the present case on the prior ruling on demurrer, Tipton et al. v. Bearl Sprott Co., Inc., et al., 9 Cir., 1949, 175 F.2d 432, the Court said: "In determining whether complaint seeking overtime compensation under the Fair Labor Standards Act stated claim upon which relief could be granted, district court was required on motion to dismiss to accept as true all well-pleaded allegations including allegations that at all times mentioned therein, plaintiffs were employed in process or occupation necessary to production of goods for commerce." 175 F.2d at page 432.

The Opinion adds: "In determining whether the third amended complaint stated a claim upon which relief could be granted, the District Court was required to accept as true all well-pleaded allegations of the third amended complaint, including the allegation that at all times mentioned therein appellants were employed in a process or occupation necessary to the production of goods for commerce." 175 F.2d at page 435.

In ascertaining whether the employees of Sprott were engaged in interstate commerce, we must be satisfied that what they did was necessary to the production of the goods of the lessor,—that is, Columbia. *Columbia, not Sprott, was engaged in manufacturing steel for interstate commerce.*

I have had occasion to interpret the meaning of the terms "in commerce" and "production of goods for commerce". The trend is to give to these clauses a liberal construction. See, McComb v. Dessau et al., D.C.Cal.1950, 89 F.Supp. 295.

In Armour & Co. v. Wantock, supra, the Court said:

"The petitioner seeks to limit those entitled to this classification by reading the word 'necessary' in the highly restrictive sense of 'indispensable,' 'essential,' and 'vital'—words it finds in previous pronouncements of this Court dealing with this clause. Kirschbaum v. Walling, 316 U.S. 517, 524–26, 62 S.Ct. 1116, 1120, 1121, 86 L.Ed. 1638; Overstreet v. North Shore Corp., 318 U.S. 125, 129, 130, 63 S.Ct. 494, 497, 498, 87 L.Ed. 656. * * * The argument would give an unwarranted rigidity to the application of the word 'necessary,' which has always been recognized as a word to be harmonized with its context. See McCulloch v. Maryland, 4 Wheat. 316, 413, 414, 4 L.Ed. 579. No hard and fast rule will tell us what can be dispensed with in 'the production of goods.' All depends upon the detail with which that bare phrase is clothed. In the law of infants' liability, what are 'necessaries' may well vary with the environment to which the infant is exposed: climate and station in life and many other factors. So, too, no hard and fast rule may be transposed from one industry to another to say what is necessary in 'the production of goods.' * * *

" 'Whatever terminology is used, the criterion is necessarily one of degree and must be so defined.' Santa Cruz Fruit Packing Co. v. National Labor Relations Board, 303 U.S. 453, 467, 58 S.Ct. 656, 660, 82 L.Ed. 954; Kirschbaum v. Walling, 316 U.S. 517, 526, 62 S.Ct. 1116, 1121, 86 L.Ed. 1638. In their context, the restrictive words like 'indispensable,' which petitioner quotes, do not have the automatic significance petitioner seeks to give them. What is required is a practical judgment as to whether

the particular employer actually operates the work as part of *an integrated effort for the production of goods."* 323 U.S. at page 129, 65 S.Ct. at page 166.

The last sentence of the quotation gives us an insight into what the Court had in mind. In determining each case, we must (1) find who the employer was, and (2) we must determine whether the work which the employee was doing was *a part of the integrated effort to produce certain goods.*

If we examine the employers' liability cases, to which the Courts have referred repeatedly, in trying to interpret the present statute, we find that, in determining the coverage of that Act, 45 U.S.C.A. § 51 et seq., the Courts have adopted a criterion which may be summed up in this manner:

*If an employee was performing a function which was directly connected with or affected interstate commerce, or was doing something in furtherance of that commerce, whether he was assisting in the preparation or preservation of rolling stock or equipment or material used for repairs, he was subject to the Act.*

In Holl v. Southern Pacific Co., D.C.Cal. 1947, 71 F.Supp. 21, I had occasion to examine thoroughly the law on the subject. In arriving at the conclusion in the particular case, I relied upon the principle that, in interpreting the word "furtherance" in the Federal Employers' Liability Act, we must bear in mind that it is a comprehensive term. Nevertheless, I reached the conclusion that an employee of the Southern Pacific Company, who was employed in the office of the freight claim department as an assistant distribution clerk, whose only duty was to write on a form the route over which freight had traveled, as to which a claim for loss or damage was being made, was not engaged in "furthering" interstate commerce so as to have the protection of the law.

### III. The Available Precedents

The leading cases dealing with the particular problem confronting us in this case are the McLeod, the Womack, and the Hanson cases.

In McLeod v. Threlkeld, 1943, 319 U.S. 491, 63 S.Ct. 1248, 87 L.Ed. 1538, the question did not turn upon the provision which we are considering now. It turned upon the proposition whether McLeod was engaged "in commerce." Nevertheless, because his occupation related to nutrition,—to feeding, —the case has a significant bearing upon the problem before us.

McLeod was employed to prepare meals for the maintenance-of-way employees of an interstate railroad, under a contract between his employer and the railroad company.

Mr. Justice Reed, in writing for the majority of the Court said: "McLeod was not engaged in the production of goods for commerce. His duties as cook and caretaker for maintenance-of-way men on a railroad lie completely outside that clause. Our question is whether he was 'engaged in commerce.' We have held that this clause covered every employee in the 'channels of interstate commerce'." 319 U.S. at pages 493–494, 63 S.Ct. at page 1250.

After discussing the various analogies sought to be drawn from employers' liability cases, the conclusion is reached that McLeod was "not engaged in commerce". The language used by the Court is very revealing: "It is not important whether the employer, in this case the contractor, is engaged in interstate commerce. It is the work of the employee which is decisive. Here the employee supplies the personal needs of the maintenance-of-way men. Food is consumed apart from their work. The furnishing of board seems to us as remote from commerce, in this instance, as in the cases where employees supply themselves. In one instance the food would be as necessary for the continuance of their labor as in the other." 319 U.S. at page 497, 63 S.Ct. at page 1252.

In Consolidated Timber Co. v. Womack, 9 Cir., 1942, 132 F.2d 101, the Court was confronted with a situation where a logging corporation operated a cookhouse near its logging camp to feed loggers. The Court held that they came under the law, saying: "The employees in our case (com-

pare the last sentence just above quoted) were actually assisting the work of the loggers by keeping their board close to their place of work, thus rendering it easier (perhaps, even, possible) for Consolidated to maintain a proper organization of its loggers and forwarding their work by furnishing the food whereby the men were given the strength to pursue their labors. And, in our determination, we find ourselves well within the limitations—the lines drawn —in a case lately announced by the Supreme Court involving substantially the same basic question, Kirschbaum v. Walling, and Arsenal Bldg. Corp. v. Walling, 316 U.S. 517, 62 S.Ct. 1116, 86 L.Ed. 1638." 132 F.2d at page 105. The Court evidently felt that the reasoning applied by the Supreme Court in the Kirschbaum case, Kirschbaum v. Walling, 1942, 316 U.S. 517, 62 S.Ct. 1116, 86 L.Ed. 1638—controlled.

In Hanson v. Lagerstrom, 8 Cir., 1943, 133 F.2d 120, the conditions were almost the same. The employer operating a logging camp to cut pulpwood for conversion into wood products for shipment in interstate commerce, maintained a cook house which sold meals chiefly to employees. It gave negligible service to the public. The employer admitted that, if logging operations ceased, he would close the cook house. The Court held that the cook was "engaged in commerce". So doing, the Court followed the decision of the Court of Appeals for the Ninth Circuit, Consolidated Timber Co. v. Womack, supra., saying:

"We are in accord with that view. Defendant stresses certain facts as indicating that the cook house in the camp, was not an indispensable part of the defendant's operations and that camps could be operated without a cook house where farmers and shackers might be employed, and it is pointed out that such camps now produce about 70 or 75 percent of the timber for pulpwood.

"The proximity of hotels at Little Falls and Big Falls, Minnesota, the presence of a highway running past the camp within 150 feet, and other roads kept open the year around, with many men owning cars of their own, are cited as indicating the non-essential character of the cook house. It is also said that the cost of production is the same whether the camp method is used or farmers and shackers are hired. But these suggestions are aside from the question. *The fact that defendant might have employed other methods, thus avoiding the necessity of maintaining a cook house, is not important. We are here 'confronted with a condition and not a theory'. We must here confine our consideration to what was actually done and not to what might have been done."* 133 F.2d at page 122. (Emphasis added.)

In applying the test which Mr. Justice Jackson laid down in Armour & Co. v. Wantock, 1944, 323 U.S. 133, 65 S.Ct. 168, 89 L.Ed. 118,—in determining the relationship of the parties, we are concerned, to some extent, at least, with the question of *who is the employer*. In these three cases, the employer was the person *who was actually engaged in producing goods for interstate commerce*. In the other two cases, the Court held that employees in a cook house, operated in a plant away from the city, by the employer, himself, *as an integral part of his operations*, were engaged in the production of goods for interstate commerce.

In short, the Courts, in the last two instances, felt that the activities were *part of an integrated effort in the production of goods*. The case of Basik v. General Motors Corp., 1945, 311 Mich. 705, 19 N.W.2d 142, 159 A.L.R. 966, involved a *cafeteria*. But the cafeteria *was operated not by an independent contractor, but by the General Motors Corporation*. The decision of the Court is based upon the reasoning of the other cases, and also upon the additional ground that the lunch and rest periods were *so short that employees did not have an opportunity to go out and secure food*,—a fact which the Opinion stresses:

"Plaintiff Steve Basik and others were employed in the Fleetwood, Ternstedt and Fisher plants of defendant General Motors Corporation, where goods were produced for commerce during the period mentioned. As cooks, wagon attendants, truck drivers, and kitchen help they handled, prepared,

distributed, and served food, etc., to other employees who desired to buy their meals, food or drinks in the plants rather than bring them, or eat at some outside restaurant or lunch counter. Defendant owns and operates the cafeteria equipment, lunch wagons, and other facilities in these plants.

*"The lunch periods vary from 18 to 30 minutes, and there are rest periods of 10 minutes each in the morning and afternoon. Employees do not have time to leave the plants to secure food, nor can all of the employees as a group go out of the plant at one time in order to obtain their lunches."* 311 Mich. at page 705, 19 N.W.2d at page 143. 159 A.L.R. at page 966. (Emphasis added.)

From these cases, I draw the inference that before *the furnishing of food can be said to be a part of an integrated effort for the production of goods, there must be, not simply the fact that "a man must eat" in order to work, but there must be some conditions which make it necessary for the employer to furnish facilities for in-plant eating.* These exist where (1) either the period is too brief to allow employees to go out, or (2) the facilities are at a distance, and (3) where the employer, for these and other reasons, determines to integrate the process of nutrition into the process of production of goods.

So the cases just referred to lay down the criteria which we must follow. Consequently, where these criteria *are not present,* where the employer is not himself engaged in nutrition, where the place of employment is not remote from access to restaurants, where the period is adequate to allow such access, and there is no showing, direct or inferential, that the establishment of the in-plant feeding was necessitated by these or other conditions, the employees of the restaurant *are not* engaged in the production of goods for interstate commerce, because their function is not necessary to the production of these goods.

Judge Smith, in Bayer v. Courtemanche, D.C.Conn.1947, 76 F.Supp. 193, and Judge La Buy, in Kuhn et al. v. Canteen Food Service, Inc., et al, D.C.Ill.1944, 77 F.Supp.

585, reached such conclusions under facts very similar to the facts in this case. Distinguishing the maintenance cases, Judge La Buy says: "But it does not follow from this line of cases that the furnishing of food to employees in a plant is necessary to the production of goods in a plant. No analogy whatsoever can be drawn therefrom. As was said in the McLeod case above cited: 'Here the employee supplies the personal needs of the maintenance-of-way men. Food is consumed apart from their work. The furnishing of board seems to us as remote from commerce, in this instance, as in the cases where employees supply themselves. In one instance the food would be as necessary for the continuance of their labor as in the other.' And so with the plaintiffs here; they supplied the personal needs of the employees of the plant in which the goods were manufactured; such employees consumed any food they purchased from the defendant corporation apart from their work; the furnishing of the food is as remote from the production of goods for commerce as it is remote from commerce; the furnishing of the food is as remote from the production of goods for commerce as in cases where the employees supply themselves; and in the case of furnishing food to a maintenance-of-way man engaged in commerce, the food would be as necessary for the continuance of his labor, as the continuance of the labor of a man engaged in the production of goods for use in commerce." 77 F.Supp. at page 590.

The Judge then referred to the Womack case, and in my opinion distinguished it very successfully: "That case is readily distinguishable from the present case inasmuch as the cafeteria or restaurant operated by defendant corporation (a) was a separate and independent establishment; (b) it was not a part of the facilities of the Company which operated the plant and produced the goods; (c) it is not shown in the complaint that any restaurant was a link in the chain of production of goods; (d) it is not shown by any allegation of the complaint that the service rendered by these independent establishments of defendant corporation were a means whereby the plant manufacturer

accomplished the purpose of its existence. *The court is convinced that in cases where the production of goods is in an isolated spot where board cannot be readily obtained by employees, that it would be necessary for the company to furnish board to its employees, and in such cases the furnishing of the board would be a necessary part of the production of the goods. But where an independent contractor furnishes and makes available a service to employees of a plant and it is not shown that this service is a part of the manufacturer's business, then the service in furnishing food and refreshments is for the convenience but not necessity of the employees of the manufacturer, and service is not bound by such a close tie as makes the service thus made available to the plant employees necessary to the production of the goods."* 77 F.Supp. at page 591. (Emphasis added.)

Judge Smith, in the Bayer case, makes a similar distinction:

"On the facts the case at bar is closest to the plant-cafeteria case in which coverage was refused by the District Court for the Western District of Illinois, *for here also there has been no showing that the time for lunch was too short for the production workers to eat outside, nor that restaurants were not available nearby, nor that the service in them was inadequate for the workers in the area, nor, indeed, that any great proportion of the production employees of the plant availed themselves of the cafeteria at mealtimes.*

"Had any of these elements been shown by the plaintiff, it might be that his work could be considered necessary, but, in their absence, in view of the remoteness of plaintiff's work from the actual production of the goods for commerce, and in view of his employment by an independent contractor and the essentially local nature of restaurants and cafeterias generally, we must hold his work to be local in nature, even though there is one factor in his favor, that of employment solely in the same building where the production is carried on. Congress might have considered that hour and wage condition throughout such a building should meet a common minimum and have so pro-

vided. That has not, however, been made the criterion, but rather whether the work is 'necessary to the production' or 'local'. The combination of factors here seems better to fit the 'local' label." 76 F.Supp. at page 196. (Emphasis added.)

### IV. The Law Applied to the Undisputed Facts

Coming back to the facts as stipulated in this case, it is quite evident that, unless we were to stretch the language of the statute and interpret the word "necessary" as synonymous with "convenient", the plaintiffs in this case *are not* under the statute.

We have a cafeteria operated by a restaurateur in a steel plant, owned by a steel company, under a contract which is nothing more than a lease. The contract has none of the indicia of a joint adventure, as that relationship is known in the law of California or in the law of the United States. 48 C.J.S., Joint Adventures, § 1(5), p. 806. The owners of the steel plant have no control over the restaurant's employees. They do not determine their wages, their hours of work; nor do they furnish them any protection against injury. They would not be liable, under the California employers' liability law, if any of the cafeteria employees were injured in the course of employment. Indeed, the contract negatives such possibility by specifically providing that Sprott is to protect himself against such liability.

Columbia prescribes the hours during which meals are to be served,—so as to make them synchronize with the rest periods of the employees. And, in order to prevent undue enrichment, it limits Sprott's profits.

The record shows that, except during one month, the enterprise was carried on at a loss. The only month in which there was a profit was January, 1946, and the *profit was $37.77.*

The statement of facts shows that the loss to Sprott in 1945 was *$5,923.82.* And, in the year following, when he operated as a corporation, the loss was, for the eight months' period, $6,194.28.

I find no liability, on the part of Columbia, to save Sprott harmless from loss.

And, unless, out of magnanimity, they made a gift to him to cover his losses, they were not legally bound to do so. And there is no evidence that they covered or shared Sprott's losses.

I began this opinion by referring to the statement of Mr. Justice Jackson in the Armour case, supra, because the plaintiff has relied on that case as the foundation stone of his contention. So I sum up the reasons why that case does not spell liability for the defendant here.

The ruling in that case definitely requires that before any operation be considered necessary for the production of goods for interstate commerce, we find that *it is a part of an integrated effort for the production of the goods.*

The evidence in this case shows nothing more than that, *for the convenience of its employees,* Columbia entered into an agreement whereby it granted a lease to Sprott in order to have available, *for the convenience of such of their employees as desired to avail themselves of it,* cafeteria service.

The employees were not *compelled* to patronize the cafeteria, although the cafeteria was not allowed to cater to anyone else except the employees and their visitors. *Columbia did not control the hours, wages or conditions of employment of the cafeteria employees. They were Sprott's not Columbia's employees.* The only controls which Columbia exercised were over the hours during which food service was furnished. It also took precautions in order that the employees be not imposed upon by exorbitant prices.

While, by size of population, Torrance is a small town, the stipulation and the facts of which we take judicial notice, indicate that it is really a part of a large metropolitan area with adequate and accessible facilities in the field of nutrition and other fields. So there is entire absence of any parallelism between this case and the extraordinary cases in which in-plant nutrition has been deemed a necessary element in the production of goods.

Judgment will, therefore, be for the defendants.