235 F.2d 638
 James P. MITCHELL, Secretary of Labor, United States Department of Labor, Appellant,
v.
Harold S. ANDERSON, Jr., Robert W. Anderson, and Alfred F. Ohl, Individually and as Copartners, Doing Business as H. S. Anderson Company, Appellee.
 No. 14327.
 United States Court of Appeals Ninth Circuit.
 August 25, 1955.
 Rehearing Denied July 30, 1956.
 
 Stuart Rothman, Solicitor, Bessie Margolin, Dept. of Labor, Washington, D. C., George E. Duemler, Los Angeles, Cal., William W. Watson, Washington, D. C., Dept. of Labor, Kenneth C. Robertson, Regional Atty., Dept. of Labor, San Francisco, Cal., for appellant.
 Gibson, Dunn & Crutcher, Sherman Welpton, Jr., W. French Smith, James J. Ryan, Los Angeles, Cal., for appellees.
 Before STEPHENS and FEE, Circuit Judges, and WIIG, District Judge.
 STEPHENS, Circuit Judge.
 
 
 1
 A place called Darwin, less than 150 population, lies in the Mojave desert in California, and may be likened to a trading post for those who are engaged directly and indirectly in the mining industry of the Anaconda Copper Mining Company whose "Darwin Mine" is located about a mile from the town and is operated in two shifts under approximately 250 employees. The product moves in interstate commerce. The business part of the town consists of a post office, an automobile service station, a small short-order lunch counter, a small sandwich and chili lunch place, and a grocery store. The sandwich shop opens at 10:00 a. m., but is closed Thursdays Saturdays, and Sundays. A paved highway, connects the town with Keeler, population 150, twenty-odd miles away; Olancha, population 200, about 35 miles away; Panamint Springs, population 12, about 15 miles away; and Lone Pine, population about 1500, around 40 miles away. There are meager accommodations at each of these places. There is no public passenger service in or out of the town. There are no privately operated rooming houses in Darwin, and no public dining places other than the lunch places mentioned. Anaconda owns some house trailers and some small houses in which some of its employees live, and there are a few privately owned houses in which employees live.
 
 
 2
 Prior to November, 1945, Anaconda owned and operated a bunk house and mess hall adjacent to the mine in which some of its male employees were accommodated. Subsequently to said date, Anaconda entered into a contract with H. S. Anderson Company under which Anderson (referred to in the contract and in this opinion as "Operator") took over the possession and operation of the facility mentioned. It is of some importance to note that Anaconda kept a strong guiding hand over Operator in the operation of the facility. Neither before nor after Operator took over was the facility run as a profit to Anaconda. Operator has run the facility under a minimum profit guaranteed by Anaconda. The contract further provides that Anaconda shall furnish equipment including expendable items, though not replacement thereof, garbage and refuse disposal. Operator is required to furnish meals to employees at hours suitable for the two shifts worked, and the food shall be wholesome and under Anaconda's direction. Operator shall procure and pay for public liability and property damage insurance, as Anaconda prescribes, and the contract may be cancelled upon 30 days' notice from either party. Payment for facilities used by Anaconda's employees is deducted from their wages and made over to Operator.
 
 
 3
 The facility accommodates occasional visitors for a flat price per meal. Guests of the mine management are occasionally accommodated at the messhall, and Anaconda compensates appellee therefor.
 
 
 4
 In operating under the contract, Operator employs eleven men who, the Secretary of Labor claims, are within the provisions of the Fair Labor Standards Act (1938), 29 U.S.C.A. § 201 et seq., as employees under Section 3(j)[1] of the Act which defines the term "produced" and delimits the employees who come under the Act, as follows:
 
 
 5
 "(j) `Produced' means produced, manufactured, mined, handled, or in any other manner worked on in any State; and for the purposes of this Act an employee shall be deemed to have been engaged in the production of goods if such employee was employed in producing, manufacturing, mining, handling, transporting, or in any other manner working on such goods, or in any closely related process or occupation directly essential to the production thereof, in any State." [Emphasis added]
 
 
 6
 Prior to 1949, the Act, in addition to covering employees who worked directly upon the goods produced, covered those who were engaged in any process or occupation "necessary" to the production of the goods.
 
 
 7
 The trial court found that the occupation of the employees within the facility are not essential to Anaconda's production of goods since Anaconda's employees at the mine could reasonably have secured board and lodging otherwise than through the mess hall and bunk house facility. Accordingly, the employees within the facility were held to be outside the coverage of the Fair Labor Standards Act. The Secretary of Labor is here appealing from the judgment entered.
 
 
 8
 It was said in Kirschbaum Co. v. Walling, 1942, 316 U.S. 517, 524, 62 S.Ct. 1116, 1120, 86 L.Ed. 1638: "But the provisions of the Act expressly make its application dependent upon the character of the employees' activities." And in Walling v. Jacksonville Paper Co., 1943, 317 U.S. 564, 571, 63 S.Ct. 332, 337, 87 L.Ed. 460, we find: "The applicability of the Act is dependent on the character of the employees' work." And we said in Tipton v. Bearl Sprott Co., 9 Cir., 1949, 175 F.2d 432, 435, that "* * * the applicability * * * is determined, not by the nature of the employer's business, but by the character of the employee's activities."
 
 
 9
 It is of course essential that employees have adequate food and lodging and if these are not available otherwise, there can be no product unless the employer acts to furnish them. When he does so, employees working in such facility are doing work as "necessary" or as "essential" as those who work in the "factory" proper. Such is the broad principle of our Consolidated Timber Co. v. Womack Case, 1942, 9 Cir., 132 F.2d 101, 106. The Womack case concerned the status of men employed in two cook houses conducted by a logging company. There was a lower cook house in a village providing more public eating facilities than Darwin provided in our case. The trial judge found that the employees in this lower cook house were not within the coverage of the Fair Labor Standards Act. The upper cook house was deeper in the woods, and other facilities were somewhat less than those at Darwin. The trial judge found that the employees in the upper location were within the coverage of the Act. This court, 132 F. 2d at page 106 in a comprehensive opinion written in 1942 (before the Act's amendment) by the late Circuit Judge Francis A. Garrecht, ruled that the employees in both cook houses were within the Act, quoting from Kirschbaum Co. v. Walling, 316 U.S. 517, 525, 526, 62 S.Ct. 1116, 1121, 86 L.Ed. 1638, as follows: "`* * * In our judgment, the work of the employees in these cases had such a close and immediate tie with the process of production for commerce, and was therefore so much an essential part of it, that the employees are to be regarded as engaged in an occupation "necessary to the production of goods for commerce."'" See, also, Hanson v. Lagerstrom, 1943, 8 Cir., 133 F.2d 120; and Kirschbaum Co. v. Walling, 1942, 316 U.S. 517, 62 S.Ct. 1116, 86 L.Ed. 1638, supra.
 
 
 10
 And this principle is not governed by whether the facility was absolutely necessary to any operation of the enterprise. In the Womack case, supra, it would have been possible for food to have reached the men so that some lumbering could have been done. In our case the mine in all probability could continue in operation in some manner without the mess hall and the bunk house. However, in each instance the facility furnished was without a question needed, and without it the production would have been affected. We are of the opinion that the employees within the facility were pursuing an occupation which, in the circumstances, was directly essential to the production of the ore for commerce, just as in Womack the employees in the cookhouses were performing a service necessary for the production of logs for commerce.
 
 
 11
 We are not unmindful of the cause for the amendment to the Act, as revealed by committee reports and Congressional debates. Some courts, in construing the Act before the amendment, gave the word "necessary" a very broad meaning. That is, the work done was held to be necessary if it was useful and needed in the production of goods. There was no formula possible for the exact separation of employment within the Act, from employment outside the Act, and the coverage appears to have been extended beyond the Congressional intent to employees in activities not directly contributing to the production of goods. The amendment was intended to cut off incidental or fringe coverage. We think the undisputed facts of this case bring it outside the change in the coverage intended or accomplished by the amendment and that the broad principles pronounced in the Womack, Hanson, and Kirschbaum cases, supra remain unchanged.
 
 
 12
 Such is the basis for our own opinion in General Electric Co. v. Porter, 1953, 9 Cir., 208 F.2d 805. And in the opinion written by Judge Soper, in Hawkins v. E. I. DuPont De Nemours & Co., 1951, 4 Cir., 192 F.2d 294. Each of these two latter cases was decided after the amendment.
 
 
 13
 Appellee's contention that McLeod v. Threlkeld, 1943, 319 U.S. 491, 63 S.Ct. 1248, 87 L.Ed. 1538, overrules or weakens Consolidated Timber Co. v. Womack, supra, cannot be sustained. The McLeod case is not concerned with the "production of goods for commerce" but with the subject of "in commerce". The opinion clearly states the difference. In our estimation, the cited case in no sense weakens the Womack case.
 
 
 14
 It would seem that the trial court was of the opinion that the mess hall and the bunk house were mere conveniences and that the operation of the mine would go on without material change if these conveniences were not available. We think the doctrine of United States v. U. S. Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746, applies, namely, that upon consideration of the evidence as a whole we are convinced that a mistake has been made.
 
 
 15
 The evidence in our case is not: Could Anaconda possibly continue its operation in some sort of way without the facility?
 
 
 16
 Rather, it is: Is there substantial need for it and for Anaconda's provision for it?
 
 
 17
 Is it clear that Anaconda is mistaken in its judgment that its outlay and continued investment in the facility is reasonably needed in order that the employees shall be fed wholesome food and be properly and conveniently housed? Is it clear that the hiring of men and the continuity of service would not be made substantially difficult if the facility should be abandoned? Can it reasonably be assumed that the type of employee who fills these not altogether choice or comfortable jobs has an automobile to transport himself daily from twenty to forty miles and back to his room and board in the towns mentioned? These and other questions present themselves when the need for the facility is under consideration. We hold that the evidence permits of no other conclusion than that Anaconda's furnishing of the facility was essential to its business.
 
 
 18
 It was contended by Operator in the district court, and here, that his employees are outside the coverage because they are employed in a retail establishment under § 13(a) (2) of the Act.[2] The court made no finding on that issue. The trial judge was of the opinion that the employees in the facility were not in an occupation directly essential to Anaconda's production of goods. Under such holding, the court no doubt thought it was unnecessary to make a finding on the issue mentioned. However, since we take a different view of what may be termed the main issue, the other issue assumes a new importance.
 
 
 19
 It was testified by one who qualified as an expert that the facts of this case constitute the facility a retail establishment, or that it would be so considered by an established restaurant association as to which he occupied an official position. However, we are of the opinion that the evidence conclusively establishes, as we have concluded, that the facility is an integrated part of the Anaconda enterprise and that such conclusion is inconsistent with any conclusion that it is a retail enterprise. See Consolidated Timber Co. v. Womack, 1942, 9 Cir., 132 F.2d 101, on this point.
 
 
 20
 We therefore do not believe it useful or necessary to remand the case for further findings. See Sbicca-Del Mac v. Milius Shoe Co., 8 Cir., 145 F.2d 389, 400[28].
 
 
 21
 It is contended by appellees that they are independent contractors and are running a business as such. This claim may be technically sound, but we think it does not change the status of the employees within the facility. Realistically, appellees are managing the facility for Anaconda, and as a facility directly essential for Anaconda's enterprise.
 
 
 22
 Judgment is reversed.
 
 
 
 Notes:
 
 
 [1]
 Title 29 U.S.C.A. § 203, June 25, 1938, c. 676, § 3, 52 Stat. 1060, as amended Oct. 26, 1949, c. 736, § 3, 63 Stat. 911; 1946 Reorg. Plan No. 2, § 1, eff. July 16, 1946, 11 FR 7873, 60 Stat. 1095, 5 U.S.C.A. § 133y-16 note
 
 
 [2]
 Title 29 U.S.C.A. § 213(a) (2), June 25, 1938, c. 676, § 13, 52 Stat. 1067, Aug. 9, 1939, c. 605, 53 Stat. 1266, as amended Oct. 26, 1949, c. 736, § 11, 63 Stat. 917
 
 
 
 23
 JAMES ALGER FEE, Circuit Judge (dissenting).
 
 
 24
 This case should have been affirmed or at most remanded for further findings of fact.
 
 
 25
 The majority have made two vital and essential findings without which the conclusion reached cannot be supported:
 
 
 26
 (a) It was found by implication that "The employees of H. S. Anderson Company are engaged in the production of goods for commerce."
 
 
 27
 (b) It is expressly found in the opinion that "the facility is an integrated part of the Anaconda enterprise" and not a "retail establishment."
 
 
 28
 The first finding is a pillar which must be present to uphold the judgment this Court directs to be entered. The second is no less essential under § 13(a) (2) of the Fair Labor Standards Act, 29 U.S. C.A. § 213(a) (2). The writer expresses no opinion on these postulated facts, except to say that the trial court did not make them and that there is conflicting evidence. But the authority of this Court does not extend to making findings of fact.
 
 
 29
 The trial court did make pertinent findings which are not held clearly erroneous but the effect of which is avoided by the suggestion that, on the record as a whole, another result must be reached. But, if this be true, the case should be sent for reconsideration and new findings. The findings of fact of the trial court, which seem supported by almost uncontroverted evidence, are set out in the margin.[1]
 
 
 30
 The majority opinion uses the phrase that the facilities are "reasonably needed," instead of the statutory text which excludes coverage unless these are "closely related or directly essential" to the mining operation. The general intention of Congress to restrict the boundaries of coverage of the Act, which was evidenced by the amendment of 1949, has thus been disregarded by the majority opinion.
 
 
 
 Notes:
 
 
 [1]
 
 Findings of Fact.
 (1) Defendants Harold S. Anderson and Alfred F. Ohl are copartners in a concern doing business as H. S. Anderson Co. Defendants operate three establishments providing dining and lodging facilities in various localities in California, each under contract with a commercial company. The main office is in West Los Angeles, California. The employees involved in this case are employed by defendants at their establishment located on certain property owned by the Anaconda Copper Mining Company (hereinafter referred to as "Anaconda") near Darwin, Inyo County, California. The buildings and facilities used by the defendants in this operation are leased from Anaconda under the terms of the contract hereinafter referred to. Defendants operate in accordance with the terms of said contract as an independent contractor with management, operation and maintenance functions relative to the provision of dining and lodging facilities being entirely performed by defendants. Approximately 11 employees of defendants are regularly employed by defendants at their Anaconda operation. The wages, hours and working conditions of employees of defendants are determined by defendants. Such employees are supervised, controlled and directed by defendants. These employees are engaged in furnishing dining, lodging and commissary service to employees of Anaconda, and occasionally and incidentally to other persons * * *
 For the purposes of this litigation only, the employees of Anaconda at the Darwin Mine are engaged in the mining and milling of lead, silver and zinc ores, which ores are regularly shipped in interstate commerce.
 (3) Anaconda at the Darwin Mine on August 12, 1953, and theretofore, employed approximately 236 employees * * * Many of these employees rent homes owned by Anaconda on the Anaconda property, some rent trailers owned by Anaconda and some live in their own trailers located in the Anaconda trailer area, some other employees live in defendants' lodging facility and other employees reside in surrounding communities. * * *
 Approximately seven of the employees of Anaconda live in the town of Darwin. Approximately 10 live in the town of Keeler which is 22 miles from the Anaconda property and approximately 10 live in the town of Lone Pine which is 37 miles from the Anaconda property. Approximately two employees live near the Sierra Talc mine, which is located north of Highway 190 between the towns of Darwin and Keeler. These employees commute daily over highways between such communities and the Anaconda mines. Of these employees only five living in Keeler have requested and are currently waiting for housing facilities, other than defendants', on the Anaconda property.
 During the month of July, 1953, approximately 64 male employees of Anaconda lived in the lodging facility operated by defendants, which facility has a capacity of approximately 75 exclusive of those employed by defendants. During the previous six-month period, an average of 62 of said employees, with a range of from 30 to 70, have resided in said facility. Of this 62 an average of approximately 7 or 8 upon arrangement with defendants and for their own reasons do not use the dining facility at all. Others from time to time for various reasons will not use such facilities. Approximately 51 were regularly fed by the defendants at their dining facility during the month of July, with an average of 49 of said employees being fed during the previous six-month period. * * *
 (5) Defendants do no highway advertising of their facilities at the Darwin mine. Newspaper advertising of the facilities in question is sometimes done by Anaconda in recruiting employees, as indicated in Exhibit AA attached to the Stipulation. Defendants' facilities are, however, open to be patronized by the public (guests and visitors and cash meals) * * * Those other than employees of Anaconda, who patronize defendants' dining room are generally salesmen, visitors and guests of Anaconda employees, members of historical or geological organizations which have interests in the area and other members of the general public who may be in the area for other purposes. During the last six months, an average of 168 meals per month were served by defendants to visitors and guests of employees and personnel of Anaconda. * * *
 (6) Common carrier service for freight but not for passengers is operated between the Anaconda mine and the surrounding communities. Western Truck Lines makes daily delivery of mail and freight to Darwin and the Anaconda property. A contract motor carrier of ore also operates runs between the town of Lone Pine and the Anaconda mine. By arrangement between employees and prospective employees and the driver, such ore carriers provide free transportation for Anaconda employees and prospective employees between their terminal points and intermediate points en route. Up to 2 additional persons may ride in the cab with the driver. These runs are made usually about six times per day although sometimes they will be as frequent as once or twice an hour. These rides are voluntary and no record of them is kept. The chief mode of passenger transportation between the mine properties and Darwin and between Darwin and the nearby communities is by private automobile. Approximately 50% of the employees of Anaconda who reside at defendants' lodging facility own their own vehicles and regularly use them for purposes of commuting to and from the mine or the nearby communities. The remaining employees normally will ride with these employees or in vehicles operated by other Anaconda employees when there is a need or occasion for transportation.
 The roads to Darwin are rarely impassible because of the weather and then only for very short periods during which they are being cleared, although the area is subject to occasional snow.
 (7) The town of Darwin is located approximately one mile from the Anaconda facility over a black-top paved two-lane highway. * * * A restaurant, known as Darwin's Cafe, serves meals during the following hours: Saturday and Sunday, 10:00 a.m. to 2:00 a.m.; Monday, Tuesday and Wednesday, 12:00 noon to 9:00 p.m.; closed Thursdays; Friday, 12:00 noon to 2:00 a.m. * * *
 In addition to the Darwin Cafe, an establishment known as Crosson's is located in Darwin. This establishment is engaged in the selling and serving of hamburgers, chili and beans, ham sandwiches and similar items, as well as beer and soft drinks. * * *
 Darwin also contains an establishment known as Taylor's, which is a combination grocery store and dispenser of soft drinks. * * *
 In addition to the above-noted facilities, a general store is located on the Anaconda property not far from the highway to Darwin, which store is known as Lurcott's. * * *
 (8) The town of Olancha is located on the main Los Angeles-Reno highway, known as U. S. Highway 395. It is approximately 34 miles from Darwin over a black-top paved highway. Olancha contains 3 restaurants as well as three motels. Housing facilities with cooking facilities are also available. * * *
 (9) The town of Keeler is located on State Highway 190 between Darwin and Lone Pine. It is approximately 23 miles from Darwin. Keeler contains an establishment known as the Desert Club which serves short orders and meals upon a limited basis. * * *
 (10) Panamint Springs is located on State Highway 190 and is approximately 23 miles over a black-top two-lane paved highway from the Anaconda property. Panamint Springs contains a restaurant and a motel to accommodate thirty persons and is open to the general public. * * *
 (11) The town of Lone Pine is located on U. S. Highway 395 approximately 38 miles over State Highway 190 and the connecting road from Darwin. Lone Pine contains several restaurants, motels, a hotel, boarding houses, and rooming houses available to persons employed by various mining, chemical and ranch companies in the area as well as to the general public. * * *
 (15) The employees of Anaconda are not confined to Anaconda property or required by Anaconda to eat or lodge at any particular place. The employees will return to their homes during the lunch hour, or will bring their own lunches with them to the Anaconda facilities. Employees, of course, working in the mine who cannot practically leave the working area, will eat lunches at their place of work.
 (17) At its Darwin establishment, defendants' employees consist of a manager, a chef, commissary clerk, second cook, dishwashers, waiters, combination man and janitors. The parties agree that the commissary clerk is outside the scope of coverage of the Act. Plaintiff also concedes that even assuming coverage the manager is exempt under Section 13(a) (1) of the Act. * * *
 (At this point, extensive and precise findings on the work and remuneration of the various types of defendant's employees are set out in the record.)
 (19) In the event that the sales and services provided by defendants at their Darwin operation should be curtailed or abandoned entirely there would be only a temporary inconvenience to the operation of the mine; the effect upon production at the mine would be unsubstantial even during this temporary period. There would be no significant effect upon total shipments from the mine, particularly in view of stocks of ore that are kept in reserve. During the period of a recent strike threat some 20 to 25 employees terminated their employment. Shipments from the mine were not affected as a result thereof.
 (20) Defendants' facilities are maintained for Anaconda employees as a convenience only, and to a very limited extent the mess hall serves others. In the event such activity were curtailed or abandoned some employees using defendants' facilities might leave the Darwin area. Assuming, however, that as many as one-half of the employees should leave, such employees could be replaced normally within a relatively short time. Those who did not leave could obtain lodging and meals elsewhere in the vicinity. Lodging could be and has been obtained at the housing facilities located at the mine, by purchasing or renting trailers, or in the neighboring communities either by renting or in homes owned by employees. Meals, groceries, and commissary and similar items could be obtained at Lurcott's Store, at eating and grocery establishments located in Darwin, and in the surrounding communities. Such facilities would in all probability respond to any increased demand.
 Defendants' facilities are not remote and isolated to such an extent that it is removed from ordinary business competition. It is a situation different from one in which the activity is located in a remote and isolated area where competition is nonexistent.
 (21) Defendants' type of facility has become less and less frequent as a means of providing food and lodging for mining employees. Because of improved roads, better transportation and an increased desire for community living such employees are tending more and more to prefer to live in communities even at considerable distances from their place of work. It is frequent that persons employed in mining operations will live in communities at a distance of thirty to forty miles from their places of work and will commute daily by automobile, bus or other means of transportation.
 (22) On several occasions in mining communities in the western states facilities similar to those of defendants' and under circumstances similar in material respects to those of defendants' Darwin operations have been curtailed or abandoned without affecting either the production of the mine or the availability of employees. * * *
 In many mining operations, no facilities such as defendants' have existed at all. Persons employed at such mining operations have lived or are living at distances ranging from 30 to 38 miles and commute by automobile or bus daily to and from the mine. In some cases as many as one-half of the employees at the mine will so commute. * * *
 (24) Children of persons employed at the mine attend school at Darwin up to the eighth grade; children in higher grades attend school in Lone Pine, commuting daily by bus. Up until 2 years ago seventh and eighth grade students also commuted to Lone Pine, but now attend school in Darwin.
 (25) Employees living in family-housing units as distinguished from the Anderson facility tend to have a more stable employment relationship. The turnover rate among non-family men who reside in defendants' facilities is substantially higher than is true among those who lodge and eat elsewhere. Employees who upon obtaining employment at the mine reside and eat at defendants' facilities frequently will leave such facilities and obtain lodging and their meals elsewhere without affecting their employment with Anaconda. * * *
 So many factors affect the supply of labor that the presence or absence of defendants' type of facility would not be a deciding or important factor in the existence of a labor supply.
 
 
 
 31
 On Rehearing.
 
 
 32
 PER CURIAM.
 
 
 33
 The petition for rehearing is denied. We append the following citations of pertinent decisions:
 
 
 34
 Mitchell v. Joyce Agency, 348 U.S. 945, 75 S.Ct. 436, 99 L.Ed. 740; Mitchell v. C. W. Vollmer & Co., 349 U.S. 427, 75 S.Ct. 860, 99 L.Ed. 1196; Maneja v. Waialua Agricultural Co., 349 U.S. 254, 75 S.Ct. 719, 99 L.Ed. 1040; Alstate Construction Co. v. Durkin, 345 U.S. 13, 73 S.Ct. 565, 97 L.Ed. 745; Mitchell v. King Packing Co., 350 U.S. 260, 76 S.Ct. 337, rehearing denied 350 U.S. 983, 76 S.Ct. 466; Steiner v. Mitchell, 350 U.S. 247, 76 S.Ct. 330; Mitchell v. Budd Tobacco Co. and King Edward Tobacco Co., 350 U.S. 473, 76 S.Ct. 527.
 
 
 35
 See, also, Mitchell v. Myrtle Grove Packing Co., 350 U.S. 891, 76 S.Ct. 148; General Electric Co. v. Porter, 9 Cir., 208 F.2d 805, 44 A.L.R.2d 854, certiorari denied 347 U.S. 951, 74 S.Ct. 676, 98 L.Ed. 1097; Tobin v. Ramey, 5 Cir., 205 F.2d 606; 6 Cir., 206 F.2d 505, certiorari denied sub nom. Hughes Constr. Co. v. Mitchell, 346 U.S. 925, 74 S.Ct. 310, 98 L.Ed. 418; Durkin v. Fisher, 7 Cir., 204 F.2d 930, certiorari denied sub nom. Fisher v. Durkin, 346 U.S. 897, 74 S.Ct. 220, 98 L.Ed. 398; Stewart-Jordan Distributing Co. v. Tobin, 5 Cir., 210 F.2d 427, certiorari denied sub nom. Stewart-Jordan Distributing Co. v. Mitchell, 347 U.S. 1013, 74 S.Ct. 866, 98 L.Ed. 1136; Mitchell v. Pilgrim Holiness Church, 7 Cir., 210 F.2d 879, certiorari denied sub nom. Pilgrim Holiness Church v. Mitchell, 347 U.S. 1013, 74 S.Ct. 867, 98 L.Ed. 1136; Mitchell v. Famous Realty Co., 2 Cir., 211 F.2d 198, certiorari denied sub nom. Famous Realty Co. v. Mitchell, 348 U.S. 823, 75 S.Ct. 38, 99 L.Ed. 649; Chapman Fruit Co. v. Durkin, 5 Cir., 214 F.2d 630, certiorari denied sub nom. Chapman Fruit Co. v. Mitchell, 348 U.S. 897, 75 S.Ct. 218, 99 L.Ed. 704; Fort Mason Fruit Co. v. Durkin, 5 Cir., 214 F.2d 363, certiorari denied sub nom. Fort Mason Fruit Co. v. Mitchell, 348 U.S. 897, 75 S.Ct. 218, 99 L.Ed. 705; Mitchell v. Brown Engineering, 8 Cir., 224 F.2d 359, certiorari denied sub nom. Brown Engineering v. Mitchell, 350 U.S. 875, 76 S.Ct. 119; Tilbury v. Mitchell, 5 Cir., 220 F.2d 757, certiorari denied sub nom. Tilbury v. Rogers, 350 U.S. 839, 76 S.Ct. 77.
 
 
 36
 JAMES ALGER FEE, Circuit Judge, adheres to his dissent.