George P. **SHULTZ**, Secretary of Labor, United States Department of Labor, Plaintiff,

v.

**CROTTY BROTHERS TEXAS, INC.**, et al., Defendants.

Civ. A. No. 5822.

United States District Court, E. D. Texas, Beaumont Division.

Feb. 16, 1970.

L. H. Silberman, Solicitor of Labor, Washington, D. C., Major Parmenter, Reg. Sol. Truett E. Bean, Atty., U. S. Department of Labor, Dallas, Tex., for plaintiff.

Warren Whitham, Spafford, Freedman, Hamlin, Gay & Whitham, Dallas, Tex., for defendants.

## MEMORANDUM OPINION

FISHER, Chief Judge.

The Secretary of Labor sues to enjoin alleged violations of the minimum wage and overtime provisions of the Fair Labor Standards Act of 1938, as amended, 29 U.S.C.A. §§ 201–219. The Defendant, Crotty Brothers Texas, Inc., operates a cafeteria located on the plant premises of Neches Butane Products Company in Port Neches, Texas. Neches Butane has a contract with Crotty Brothers Texas under which the latter is to operate food service facilities for the purpose of furnishing "proper, hot and cold food and food service to the employes" of Neches Butane.

Neches Butane is engaged in the manufacture or production and interstate shipment of butadine, a liquefied petroleum gas which is highly volatile. The plant is enclosed by a steel wire mesh fence, and there are normally two gates in use, each manned by a guard. Persons not employed at the plant are admitted after being issued a pass at a reception office at the entrance. Approximately 225 processing employees work each of three daily shifts; they are given no time off for a meal. Other employees are allowed a thirty-minute lunch period.

The food service operation here involved is located in a separate brick building which, along with all fixed equipment and facilities, is owned by Neches Butane. Neches Butane bears all operating expenses and pays Crotty Brothers Texas a sum based upon the earnings of the food service operation.

Neches Butane also retains control over the salaries and wages paid the employees in question. Under the contract Crotty Brothers Texas is to "furnish proper * * * food * * * to the employes" of Neches Butane at such time as the later shall designate. All food and supplies are purchased by Crotty Brothers Texas. All persons engaged in preparing and serving the food are hired and subject to dismissal by Crotty Brothers Texas.

Service is cafeteria style. Breakfast is regularly served from 6:00 a.m. to 7:30 a.m., and lunch from 11:30 a.m. to 12:30 p.m. The cafeteria is ordinarily closed thereafter. Payment for meals is ordinarily made in cash to the cashier at the end of the cafeteria line. However, in the case of certain plant employees doing overtime work, Neches Butane pays for the meal and the employees may be given chips to give to the cashier, or an order for a certain number of meals will be presented by a supervisor to the cashier, which chips or orders are later redeemed by Crotty Brothers Texas for cash.

The cafeteria serves anyone who comes, and plant employees are not specially identified or accommodated in any manner differently from anyone else who might come down the serving line. It appears that persons who were not employees of Neches Butane, such as meat, grocery, and soft drink salesmen, ate in the cafeteria.

It has been stipulated that the activities of the five defendants in this case, including Crotty Brothers Texas, constitute "an enterprise engaged in commerce or in the production of goods for commerce" within the meaning of §§ 3(r) and 3(s) of the Act. It is therefore conceded that the minimum wage and overtime provisions of the Act were at all material times applicable to the employees of Defendant Crotty Brothers Texas unless they are exempted by some other specific provision.[1] It appears that during the period in question many of these employees were being paid as low as 85 cents to one dollar per hour and that they received no overtime compensation for hours worked in excess of 40 per week. Plaintiff claims that Defendant's employees were therefore underpaid in the approximate amount of $10,250 during the period from February 1, 1966, to June 1, 1969.

Provisions respecting minimum wage and overtime are set out in §§ 6 and 7 of the Act. Plaintiff alleges violations of the Act for a period commencing with and subsequent to February 1, 1966. Defendants claim that the employees in question are exempt from both the minimum wage and overtime provisions for the entire period by virtue of § 13(a) (2). Further, Defendants maintain that the employees in question are exempt from both the minimum wage and overtime provisions for the period prior to February 1, 1967, by virtue of § 13(b) (8), and from the overtime provisions subsequent to February 1, 1967, by virtue of § 13(b) (18).

Section 13(a) (2) provides exemption from minimum wage and overtime provisions for the employees of "any retail or service establishment," as defined, provided further that more than 50% of the establishment's annual dollar volume of sales of goods or services is made within the state in which it is located and that such establishment has an annual dollar volume of sales less than $250,000. Section 13(b) (8) provides exemption from the overtime (though not the minimum wage) provisions for employees of an establishment which is a "restaurant." Section 13(b) (18) provides exemption from the overtime (though not the minimum

---

1. Though Defendants admit that they constitute an "enterprise", they do not admit that the separate corporate entities comprising the enterprise are all to be included within any injunctive relief which the Court might deem appropriate should it find a violation of the Act. Rather it is contended that only the defendant Crotty Brothers Texas is subject to the jurisdiction of the Court for purposes of injunctive relief.

wage) provisions for employees of a "retail or service establishment who [are] employed primarily in connection with the preparation or offering of food or beverages for human consumption, either on the premises, or by such services as catering * * *." Prior to the 1966 amendments, effective February 1, 1967, the latter two sections provided total exemption from both minimum wage and overtime coverage. The effect of those amendments was to continue the total exemption under § 13(a) (2) but to remove the "restaurant" and "food service" exemptions to § 13(b), which provides exemption only from the overtime provisions.

Plaintiff contends that the food service activities of Crotty Brothers Texas at the Neches Butane plant do not constitute a "retail or service establishment" within the meaning of that term as employed in §§ 13(a) (2) and 13(b) (18), and that such operation was not a "restaurant" within the meaning of that term as employed in § 13(b) (8). The term "retail or service establishment" is defined in § 13(a) (2) as follows:

"A 'retail or service establishment' shall mean an establishment 75 per centum of whose annual dollar volume of sales of goods or services (or of both) is not for resale and is recognized as retail sales or services in the particular industry."

The term "restaurant" is not specially defined for the purposes of § 13(b) (8). In sum, Plaintiff argues that Crotty Brothers Texas is not entitled to the claimed exemptions because (1) its food service operation is not a "retail" service as a matter of law, (2) more than 25% of its annual dollar volume of sales are for "resale", and (3) the food service operation cannot be a "restaurant" because it is not also a retail service establishment.

### THE "RETAIL" ARGUMENT

Plaintiff's interpretation of the statute in this particular is set out in his interpretive bulletin, known as Regulation 779, as follows:

*Section 779.24* * * * Not every establishment which engages in retail selling of goods or services constitutes a retail or service establishment within the meaning of the Act.

*Section 779.316.* The term retail is alien to some businesses * * *. It was the intent of Congress to exclude such businesses from the term retail or service establishment.

*Section 779.318.* Typically a retail or service establishment is one which sells goods or services to the general public.

*Section 779.319.* Generally, however, an establishment, wherever located, will not be considered a retail or service establishment * * * if it is not ordinarily available to the general consuming public.

In an early decision the Supreme Court gave § 13(a) (2) a quite narrow construction. In Roland Elev. Co. v. Walling, 326 U.S. 657, 66 S.Ct. 413, 90 L.Ed. 383 (1946), the Court wrote:

"It is rare, if not impossible, for an employee who is engaged in an occupation necessary to the production of goods for interstate commerce to be said to be at the same time an employee engaged in a retail or service establishment whose selling and servicing is confined to ultimate consumers. These employments are largely mutually exclusive. To the extent that sales or services are necessary for the production of goods for interstate commerce they generally are by that hypothesis not sales or services to an ultimate consumer for his personal use and, accordingly, are neither 'retail' sales nor services of a comparable character, within the meaning of § 13(a) (2)." At 666–667, 66 S.Ct. at 417.

This reflected a pervasive scheme of statutory construction. Coverage under the Act for a large category of employees is determined by the definition of the term "engaged in the production

of goods" for interstate commerce as it is used in Sections 6 and 7. The term is defined in § 3(j), which at the time of the *Roland* decision read as follows:

"* * * for the purposes of this Act an employee shall be deemed to have been engaged in the production of goods if such employee was employed in producing, manufacturing, mining, handling, transporting, or in any other manner working on such goods, *or in any process or occupation necessary to the production thereof, in any State.*" (Emphasis added).

Thus the Court in *Roland* seized upon the language of this definition in holding that the § 13(a)(2) exemption is not available to employees "engaged in the production of goods for commerce."

Shortly after and in reliance upon the *Roland* decision, a district court decided the case of McComb v. Factory Stores Co. of Cleveland, 81 F.Supp. 403 (N.D. Ohio 1948). In that case Factory Stores was an independent contractor providing a general catering service for the employees of Republic Steel by operating canteens and restaurants inside Republic's plants. Factory Stores provided coupon trade books to Republic's employees for their canteen purchases. Employees who worked overtime were given meal chips by Republic to purchase meals from Factory Stores, which redeemed them in cash from Republic. Factory Stores operated a number of different establishments, some of which were located in plants enclosed by fences and where the workers were not permitted to leave the premises during their lunch break. The court denied the retail exemption of § 13(a)(2) to Factory Stores.

The strict construction supported by this line of authorities was overturned, however, by the amendments of 1949. The emphasized portion of § 3(j) as quoted above was changed to read:

"* * * or in any closely-related process or occupation directly essential to the production thereof, in any State."

Of this amendment the Statement of the Managers on the Part of the House, Conference Report No. 1453, 2 U.S.Code Cong. Service, pp. 2264–2265 (81st Cong., 1st Sess., 1949), says as follows:

"This clarification is needed in order to obviate the sweeping ruling of the Administrator and the courts that no sale of goods or services for business use is retail. See Roland Electric Co. v. Walling (326 U.S. 657 [66 S.Ct. 413, 90 L.Ed. 383]) * * *.

And at 2252–2253:

"Coverage of the act has also been extended to employees of an independently owned and operated restaurant located in a factory. (McComb v. Factory Stores, 81 F.Supp. 403 (N.D. Ohio 1948)).

"Under the bill as agreed to in conference an employee will not be covered unless he is shown to have a closer and a more direct relationship to the producing, manufacturing, etc., activity than was true in the above-cited cases.

* * * * * *

"All such employees, as well as the employees of the merchant selling his goods locally and employees engaged in providing residential, eating, or other living facilities for factory workers, are quite clearly not performing any activities that are closely related or directly essential to the production of goods."

The 1949 amendments also added to § 13(a)(2) the definition of the term "retail or service establishment" which is quoted above. According to the Statement of the Managers, supra, at 2264–2265,

"Under this test any sale or service, *regardless of the type of customer,* will have to be treated by the Administrator and courts as a retail sale or service, so long as such sale or service *is recognized in the particular industry as a retail sale or service.* * * *

"The location of the establishment, whether in an industrial plant, an of-

fice building, a railroad depot, or a Government park, etc., will make no difference in the application of the exemption."

There can be no question that these amendments have broadened the scope of the § 13(a) (2) exemption; and the Supreme Court has conceded the legislative intent to overrule the *Roland* principle, Idaho Sheet Metal Works, Inc. v. Wirtz, 383 U.S. 190, 203, 86 S.Ct. 737, 15 L. Ed.2d 694 (1966). The instant controversy is whether it has been sufficiently broadened to encompass the food service operation of Crotty Brothers Texas at the Neches Butane plant. Defendants contend that the purpose of these amendments was to make clear that the exemption of § 13(a) (2) is applicable to employees of a food service contractor whose sales are recognized as retail in the industry and regardless of the fact that the establishment is located in an industrial plant. In this regard Defendants have produced expert testimony to the fact that such an operation as the one in question is regarded as retail in the industry. However, Plaintiff denies that this is adequate to prove the right to the exemption. It is Plaintiff's contention that before the "sales test" of § 13(a) (2) may be invoked for the purpose of securing the exemption, an establishment must first possess "the traditional characteristics of a retail establishment." For this proposition is cited the decisions of the Supreme Court in Idaho Sheet Metal Works, Inc. v. Wirtz, 383 U.S. 190, 86 S.Ct. 737, 15 L.Ed.2d 694 (1966), and Mitchell v. Kentucky Finance Co., 359 U.S. 290, 79 S.Ct. 756, 3 L.Ed.2d 815 (1959).

In the cases cited the Supreme Court rejected the "industry usage" test—i.e., whether the sale of particular goods or services is recognized as retail in the particular industry—as the *sole* test in determining whether an establishment qualifies as a "retail or service establishment" under § 13(a) (2). We think, however, that it is a mistake to read these cases, as Plaintiff does, as superimposing an additional test upon the statutory requirements. In *Idaho Sheet Metal Works* the Court stated general agreement with the Secretary's contention that there should be a threshold inquiry as to whether the sale of a particular type of goods or services can ever qualify as retail whatever the terms of the sale. The Court noted that the typical retail transaction is one involving goods or services that are frequently acquired for family or personal use. However, the opinion continued to state:

"What is important for this decision is that Congress also intended that the retail exemption extend in some measure beyond consumer goods and services to embrace certain products almost never purchased for family or noncommercial use." At 203, 86 S.Ct. at 746.

The Court further noted that within the class of typical goods and services that can be sold at retail not every sale can be so classified. Section 13(a) (2) specifically excludes any sale for resale and "beyond that, references in the legislative history * * * and common parlance certainly suggest that the term retail becomes less apt as the quantity and the price discount increase in a particular transaction." At 205, 86 S.Ct. at 746. The Court declined to lay down any general rules, declared that "flexibility is certainly appropriate," and noted "the considerable discretion possessed by the Secretary."

In the specific cases before it, the Court held that one party was not entitled to claim the exemption because 83% of its gross income was derived from selling and servicing of potato processing equipment:

"The type of equipment described plainly appears to have no private or noncommercial utility. Nor does it bear much resemblance to those strictly commercial articles earlier named that may be sold at retail." At 206, 86 S.Ct. at 747.

A second party derived more than half of its dollar volume from sales to compa-

nies operating fleets of commercial vehicles and other heavy industrial machinery. The Court rejected the Secretary's argument that tire transactions relating to large trucks and industrial vehicles are intrinsically nonretail. However, denial of the exemption was upheld on the basis of the Secretary's guidelines which classed as nonretail all sales to fleets of five or more vehicles at "wholesale prices," as defined. The Court observed that the guidelines were "aimed at excluding from the retail category sales generally made at significant discounts and in quantity. Given the common conception of the term retail and references in the legislative history to discount sales * * * we see no reason not to sustain these guidelines." At 208, 86 S. Ct. at 748.

The point which the Supreme Court made in *Idaho Metal Works* was that there is no touchstone or uncomplicated test to apply in resolving the inquiry as to whether a transaction is retail, but rather a case by case approach is in order with the referents being common sense and common parlance. There are certain types and kinds of goods and services which are ordinarily not made available or acquired for personal or nonindustrial use. These can never be considered retail. Many of the cases cited by Plaintiff provide pertinent examples: Goldberg v. Sorvas, 294 F.2d 841 (3rd Cir. 1961) and Willmark Service System Inc. v. Wirtz, 317 F.2d 486 (8th Cir. 1963) (supplying shopper's investigation service to other business establishments); Durkin v. Joyce Agency, 110 F.Supp. 918 (N.D.Ill.1953) and Walling v. Sondock, 132 F.2d 77 (5th Cir. 1942) (providing watchman's service to industrial and business users); Goldberg v. Roberts, 291 F.2d 532 (9th Cir. 1961) (providing letter shop service for other businesses); Arnold v. Ben Kanowsky, Inc., 361 U.S. 388, 80 S.Ct. 453, 4 L.Ed.2d 393 (1960) (supplying a plastic fabricating service and fabricated parts to manufacturer of aircraft). It is the nonretail nature of these kinds of services that disqualifies them at the outset for purposes of the § 13(a)(2) exemption.

Thus focusing on the nature of the goods or services themselves rather than the character of the customer, the Court in *Idaho Metal Works* proceeded to reject specifically the proposition that supplying a service to an industry producing goods for commerce can never be a retail operation.

"Of course Congress' conceded intent to overrule the Roland principle means *sales of such goods or services can be retail 'whether made to private householders or to business users,'* House Conf.Rep. p. 25, but the goods and services listed nearly all share the common characteristics that they are often purchased by householders." At 202, 86 S.Ct. at 746. (Emphasis added).

Plaintiff's own regulations recognize this.

"Where a sale is recognized as retail regardless of the type of customer, its character as such will not be affected by the character of the customer, with reference to *whether he is a private individual or a business concern,* or by the use the purchaser makes of the purchased commodity." 29 C.F.R. § 779.328. (Emphasis added.)

However, Plaintiff argues more specifically that supplying a food service to an industry producing goods for commerce cannot be a retail operation, and for this proposition he has the authority of one decided case since the 1949 amendments, Mitchell v. Anderson, 235 F.2d 638 (9th Cir. 1955). In that case a panel of the Ninth Circuit held, over the dissent of Circuit Judge Fee, that the § 13(a)(2) exemption was not available to an independent contractor which, pursuant to contract with a mining company, operated a bunk house and mess hall which were adjacent to a mine. Said the Court:

"In our case the mine in all probability could continue in operation in some manner without the mess hall and the

bunk house. However, in each instance the facility furnished was without a question needed, and without it the production would have been affected. We are of the opinion that the employees within the facility were pursuing an occupation which, in the circumstances, was directly essential to the production of the ore for commerce * * *." At 641.

Said the dissenting opinion:

"The majority opinion uses the phrase that the facilities are 'reasonably needed,' instead of the statutory text which excludes coverage unless these are 'closely related or directly essential' to the mining operation. The general intention of Congress to restrict the boundaries of coverage of the Act, which was evidenced by the amendment of 1949, has thus been disregarded by the majority opinion." At 644–646.

In two recent cases involving fact situations · substantially similar to the case at bar, district courts have questioned the correctness of the Anderson decision and declined to follow it. Wirtz v. Pickett Food Service, Inc., 304 F.Supp. 784 (D.N.M.1968); Wirtz v. Crotty Brothers Dallas, Inc., C.A. No. A–68–CA–6 (W.D.Tex. Jul. 30, 1969). Certainly the reasoning of the Anderson court that the food supplied by the service contractor was an integral part of a mining operation is a bit strained, particularly in light of the evident determination of the Congress by the 1949 amendments to trim the penumbra of the Act's coverage. As Defendants point out, if the employees brought their own food to work rather than purchasing meals from a food service contractor while on the job, the food would be as necessary for the continuance of their labor in one instance as in the other. In either case the food is consumed apart from the work, and the consumption seems equally remote from the production of goods for commerce. Of course, Anderson can also be distinguished inasmuch as there was not in this case the matter of providing living accommodations for employees. The trial courts in the Pickett Food Service and Crotty Brothers Dallas cases endeavored to distinguish the Anderson case on the facts. However, we think that there is little point in that effort inasmuch as the soundness of that court's reasoning is clearly open to question; and since the decision is not binding upon this Court, we decline to follow it.

Plaintiff has urged the decisions in Pickett Food Service and Crotty Brothers Dallas as well as Wirtz v. Campus Chefs, Inc., 303 F.Supp. 1112 (N.D.Ga. 1968). In Pickett Food Service the court held that employees of a cafeteria located on and serving a NASA facility were not engaged in a process or occupation "directly related or essential to the production of goods for interstate commerce" within the meaning of § 3'(j) and that the cafeteria qualified as a "retail or service establishment" under § 13(a) (2). The facility was a missile range located some distance from any town or eating place, and its daily inhabitants were restricted to employees of the various NASA contractors and authorized guests. Lunch periods were inadequate to allow the employees to leave the facility for lunch in town. In Crotty Brothers Dallas the defendant maintained a food service pursuant to a contract with a private school. It was provided that the contractor would prepare and serve three meals daily during the school year to the faculty, students, and others authorized by the school to use the dining hall facilities. The school furnished all necessary equipment and reimbursed the contractor for all operating expenses incurred. The contractor hired its own employees, though it was obligated to dismiss any employee who might become unsatisfactory to the school. The court held that the food service operation qualified as a retail or service establishment under § 13(a) (2). In Campus Chefs it was held that a corporation operating dining halls and cafeterias under contracts with educational and other public institutions, which served primarily students and other

"contract persons" and were not generally frequented by the general public, was entitled to the § 13(a)(2) exemption.

■ The reasoning in all these cases centers upon a discerned legislative intent to extend the application of § 13(a)(2) to independently owned and operated food service establishments such as those involved in the *Factory Stores* case, regardless of whether they were located in industrial plants.[2] A "retail or service establishment" may be characterized as one which sells goods or services in small quantities to the general public and which is at the very end of the stream of distribution. The establishment of a type with which these cases are concerned is normally recognized as retail, its sales are numerous and involve small quantities, are received by the general consuming public, and it is easily distinguishable from a wholesale food operation. The goods and services are of a kind frequently required for family or personal use. In *Campus Chefs* the court said:

> "Thus not only within the industry, but from a practical, statutory, or regulatory view, it is apparent that defendant meets the tests of 'retail' and 'restaurant' *unless* such status is destroyed by (1) the failure of the general public to frequent the establishment or (2) the mode of payment. The court concludes that neither factor changes the result."

■ The retail character of a sale is not affected by the character of the customer. 29 C.F.R. § 779.328. The fact that a majority of the customers fit into a particular category as 'food contract' purchasers, is not controlling.

Furthermore, even food contract customers are part of the general consuming public. An establishment need not be frequented by the general public in the sense that the public must actually visit it. 29 C.F.R. § 779.319. A factually restricted clientele is typical of many restaurant operations located in industrial plants, office buildings, government installations, hospitals, and colleges. The court in *Pickett Food Service* concluded:

> "The evidence in the case shows that defendant imposed no restrictions upon whom it would serve. Anyone who came to the missile site could eat at its cafeteria. Indeed, such a customer need not even be someone employed at the site. No different price was charged guests than was charged employees. The same kind of food was served to all. The sales made were retail sales to the ultimate consumer within the meaning of the Act and the Regulations, *supra*."

Plaintiff has sought to distinguish the *Pickett Food Service* and *Campus Chefs* cases on the ground that in those cases the contractors bore the entire risk of profit or loss with respect to their respective food service operations, while in this case Neches Butane paid all costs and guaranteed Defendants a profit of $300.00 or more per month for its services. Plaintiff does not mention that the contract also provides that any surplus over and above costs and the $300–$500 "guaranteed" remuneration shall be paid to Neches Butane by Crotty Brothers Texas. Such a surplus occurred during one accounting period, from February 14, 1969, to March 1, 1969. It is not clear exactly why it is that Plaintiff considers this distinction to make a dif-

---

2. See 2 U.S.Code Cong. & Adm.News, pp. 2252–2253, 2264 (81st Cong., 1st Sess. 1949), quoted in pertinent part, *supra*. In light of these amendments, *Factory Stores* was remanded on appeal for further consideration, 179 F.2d 238 (6th Cir. 1949). When the Act was again amended in 1961, the House Manager's Report stated:
   "Clause (2) and (20) of Section 12(a) also are intended to continue the exemp-

tion for independently owned and operated restaurants in industrial plants, office buildings, government installations, hospitals, and colleges, such as were operated in McComb v. Factory Stores, 81 F.Supp. 403 (N.D.1948)." House Report No. 75, 87th Cong., 1st Sess., March 13, 1961.

ference. These contractual provisions are not unusual or peculiar attendant upon this kind of arrangement between a restaurant and an industrial plant, nor are they inconsistent with the idea of an independent food service contractor.[3]

## THE "RESALE" ARGUMENT

Plaintiff contends that the retail exemption of § 13(a) (2) is inapplicable because more than 25% of Crotty Brothers Texas' sales were "sales for resale." Section 13(a) (2) provides that an exempt retail establishment is one " * * * 75 per centum of whose annual dollar volume of sales * * * is not for resale * * * " The basis of this contention is the fact that under the contractual arrangement and in each year in question Crotty Brothers Texas received from 50 to 75 per cent of its income in direct payments from Neches Butane for overtime meals and beverages which the company furnished its employees. Plaintiff argues that Crotty Brothers Texas in effect sold these meals to Neches Butane, which in turn resold them to its employees. Plaintiff relies upon Mitchell v. Sherry Corine Corp., 264 F.2d 831 (4th Cir. 1959) and Goldberg v. Warren G. Kleban Engineering Corp., 303 F.2d 855 (5th Cir. 1962), as well as the still unreported decision in Shultz v. Brand Names, Inc., C.A. No. 67–21–Civ. Ft. M (M.D.Fla., Sept. 10, 1969).

In *Sherry Corine* the employer supplied meals to two air lines to be served to their passengers on interstate flights. In *Kleban* the employer sold and installed plumbing, heating, and air conditioning equipment under subcontracts to general contractors in connection with public and private building projects. In both cases the courts held that these constituted "sales for resale" so as to defeat applicability of the § 13(a) (2) exemption.

The *Kleban* decision is readily distinguishable on the facts. There the court found that the materials supplied by the employer were being, in effect, incorporated by the general contractor into a completed article for resale. The court expressed doubt that the installation of equipment in industrial construction projects can ever be a retail transaction, then said:

> "[M]ore important, in the context of the Act, the general contractor is a significant intermediary. The owner [of the building] looks to it for a completed operation. * * * [T]he purpose of the general contractor is to construct and turn over a completed facility and for which agreed compensation is paid. Moreover, when a subcontractor furnishes supplies and services, it does so with the expectation that they will be incorporated into the finished structure which thereafter is to be turned over by the contractor to another, the owner." At 858–859.

In this view a subcontractor furnishes goods and services for incorporation into a retail "package" for which the prime contractor is accountable to the customer. In our case, however, Neches Butane is not a "significant intermediary" between Crotty Brothers Texas and its cafeteria customers, for it is no intermediary at all in the sense contemplated by *Kleban*. Crotty Brothers Texas prepares the food and serves the food and in every particular directly operates its own cafeteria. All Neches Butane does is pay for some meals that are purchased in that cafeteria.

*Sherry Corine* is similarly distinguishable in that there was no contact by the employer involved with the ultimate consumer. The food was prepared and delivered to the airlines and taken aboard the planes in trays and ovens. The air-

3. Plaintiff contends that for the exemptions to be applicable the physical place of the operations and the activities conducted would have to be Crotty Brothers Texas' physically separated place of business. That argument is contrary to the legislative history quoted above, unsupported by authority, and contradicting of Plaintiff's own regulation, 29 C.F.R. § 779.319.

line hostess served the passengers after the plane was aflight. The food service was recognized as a competitive factor in air transportation, and the expense was considered as part of the cost of operation which entered into the authorized rate structure. Said the court:

"The decisive factor, in our view, is that the meals are purchased by the airlines to be distributed by them to individual passengers for consumption and that the airlines are compensated for the cost by making it a constituent element for the charge for transportation." At 835.

We are of the opinion that in making contractual arrangements for an on-premises food service for the convenience of its employees, Neches Butane does not stand as to them in the same relationship as that obtaining between an airline and its passengers. In the nature of the industry an airline is perforce engaged in the operation of a food service. Its customers expect the service. As the court pointed out in *Sherry Corine*, the meals are distributed by the airlines to their passengers as a part of the inflight services which are included in the transportation charge. But the overtime meals for which Neches Butane paid Crotty Brothers Texas amounted to compensation to the employees. Neches Butane did not undertake to provide a particular service for hire, but rather it adopted this method of compensating its employees for overtime work. The same purpose would have been accomplished had the employee simply been given cash and allowed to pay the cafeteria cashier personally. The mechanics of the transaction do not seem that important. The food was prepared and served by Crotty Brothers Texas in each instance. Neches Butane never acquired possession of the food nor any title to it. In effect the arrangement was a convenient one for all parties. In result it made no difference to Neches Butane, to the employee, or to Crotty Brothers Texas. It should then make no more difference to the Court.

The *Brand Names* case provides Plaintiff with a slightly stronger precedent. There the Defendant Brand Names, Inc., operated a restaurant and motel and was a wholly owned subsidiary of Gulf American Corporation. Gulf American was engaged in development of raw acreage into a combined residential, recreational, and commercial area; and as a sales promotion it operated a program known as "Fly and Buy" whereby it furnished prospective buyers air transportation, lodging and meals for a three-day visit, at a cost to the prospective customer of $50.00. The customers were lodged and fed in Brand Names' hotel and restaurant, and the cost was adjusted by accounting between parent and subsidary. The accounting of Brand Names to Gulf American for meals served the latter's prospective buyers accounted for more than 25% of the annual dollar volume done by the restaurant.

*Brand Names* may appear more closely in point because of the fact that the meals involved there were served by the food service contractor on its own premises, yet it was held that these constituted "sales for resale" under the circumstances. Nonetheless, the case is distinguishable. The lodging, food and meals billed to Gulf American Corporation were carried on its books as costs and expenses of real estate sales. Statements in the parent company's annual report indicated its enthusiasm for this marketing procedure. The motel itself gave preference to Gulf Americans' customers when facilities were limited. Like employees of other subsidiaries of Gulf American, Brand Names' employees were paid by payroll checks issued by another division of the parent company which had a computer program for payroll. The defendants' own expert witness testified that Brand Names was apparently part of a single "unit or enterprise" dominated by Gulf American Corporation and primarily engaged in making real estate sales, and that the billings for services rendered the latter's real estate customers might be consid-

ered as part of those land sales transactions and of the costs and expenses of those transactions. Like the airlines in *Sherry Corine,* Gulf American collected in advance a fare for a flight-plan air trip which included the cost of meals and lodging furnished and served to its customers. It is clear that Brand Names was not in these circumstances an independent service contractor but rather a supplier of goods and services that contributed to Gulf American's retail "package."

Central to both *Brand Names* and *Sherry Corine* is this factor distinguishing them from the case at bar: the employer was providing goods and services to another party's customers. In our case the persons served in the cafeteria operated by Crotty Brothers Texas were not Neches Butane's customers but its employees; and Neches Butane was not selling food to those individuals but rather buying them a meal as a kind of compensation for overtime work. To conclude otherwise would be to hold that a meal is resold whenever a third party picks up the check. The court in the *Campus Chefs* case spoke to this issue

> "Such a narrow technical view is untenable in the practicable application of the act to everyday business operations. A considerable number of retail sales are made daily where the payment goes to a third party such as American Express, Diner's Club, bank credit plans, private and civic clubs, lease arrangements, salary checkoffs, and the like wherein the seller looks solely to the third party for payment. The retail characteristics of the transaction are not destroyed by such payments nor are such purchases considered for resale merely because the consideration passes through an indirect conduit either before or after the actual transfer." 303 F.Supp. at 1119.

Defendants simplify the matter thus: "No resale occurs if one man takes another to dinner." We think that neither *Sherry Corine* nor *Brand Names* is in conflict with that basic proposition, and on the facts of this case Plaintiff's "resale" argument should be rejected.

## THE "RESTAURANT" ARGUMENT

■ When the food service exemption was removed from § 13(a) (2) to § 13(b) (8) by the 1966 amendments, Congress declined to employ the term "retail or service establishment" but specifically designated that the exemption should apply to any "restaurant." This anomaly has given rise to an incidental disagreement between the parties. Defendants have sought to broaden the umbrella of coverage available to them by contending that even if Crotty Brothers Texas' cafeteria is not a "retail or service establishment" it can nonetheless be a "restaurant" within the purview of § 13(b) (8). Plaintiff argues that an establishment cannot be a "restaurant" unless it is also a "retail or service establishment" as defined by § 13(a) (2), that the latter term is necessarily inclusive of the former. Inasmuch as we hold that the cafeteria in question is a "retail or service establishment" so as to bring it within the total exemption from wage and overtime coverage afforded by § 13(a) (2), it is unnecessary to decide whether the operation can be considered a "restaurant" within the purview of § 13(b) (8). Accordingly, we express no opinion on this point.

Plaintiff has failed to establish his right to maintain this cause of action and, therefore, the Court will enter judgment for Defendants. This Memorandum Opinion will constitute the Findings of Fact and Conclusions of Law herein as authorized by Rule 52, F. R.Civ.P. Counsel for Defendants will submit an appropriate order.